[Civ. No. 2219. Third Appellate District.—December 27, 1920.]

E. A. GAMMON, etc., Petitioner, v. FRANK B. McKEVITT et al., Respondents.

[1] HIGHWAYS—GOOD ROADS ACT — PREPARATION OF SPECIFICATIONS — PORTION OF WORK—MANDAMUS.—The requirement of section 9 of the Good Roads Act that the highway commission, as soon as the funds raised by the sale of bonds are in the treasury, shall proceed to prepare detailed specifications, plans, and profiles "for the work to be done," or such parts of it as the commission deems advisable to have done separately, has reference to the whole work, and a writ of mandate will not lie to compel the commission to prepare specifications for a portion of the work selected by the petitioner.

[2] MANDAMUS—EXERCISE OF DISCRETION—MANNER.—While *mandamus* may be invoked to compel the exercise of discretion, it cannot compel such discretion to be exercised in any particular way.

[3] HIGHWAYS—PURPOSE OF GOOD ROADS ACT—DURABILITY AND PERMANENCY OF CONSTRUCTION.—The purpose of the Good Roads Act is to obtain roads of a durable or permanent character, and permanency or durability of construction, in the sense used in the statute, does not mean merely impregnability to any sort of an attack that may be made upon the work, but must be considered in reference to availability for public travel and general road purposes, and a highway subject to be inundated by flood waters during the period of its greatest need or likely to be overlaid with great depths of earth in the execution of state or federal authority, or rendered inaccessible from inevitable cause, would not be such a road as the act contemplates.

[4] EVIDENCE—REPORTS OF DEBRIS COMMISSION — JUDICIAL NOTICE. — Judicial notice is taken of the reports of the California Debris Commission.

[5] HIGHWAYS—CONSTRUCTION UPON LEVEE — PROPOSED RECLAMATION WORK — PREPARATION OF SPECIFICATIONS FOR HIGHWAY — MANDAMUS.—A writ of mandate will not issue at the instance of an abutting property owner to compel a county highway commission to prepare detailed specifications, plans, and profiles, as required by the Good Roads Act, for the improvement of a designated portion of a highway, where the highway lies in a drainage district and the crown of a levee, which has never been raised or constructed to conform to the standards fixed by the state reclamation board, furnishes a base for the roadbed and in the carrying out of the plans of the California Debris Commission for the reclamation of lands within the district the levee will be required to be raised above the flood plane.

APPLICATION for a Writ of Mandate to compel a county highway commission to prepare specifications for the improvement of a portion of a highway. Petition dismissed.

The facts are stated in the opinion of the court.

Devlin & Devlin and Downey & Downey for Petitioner.

Hugh B. Bradford for Respondents.

SEAWELL, P. J., *pro tem.*—The county of Sacramento, in 1916, elected to bring itself within the benefits conferred by the provisions of an act entitled, "An act providing for the laying out, constructing, straightening, improvement and repair of main public highways in any county, providing for the voting, issuing and selling of county bonds and the acceptance of donations to pay for such work and improvements, providing for a highway commission to have charge of such work and improvements, and authorizing cities and towns to improve the portions of such highways within their corporate limits and to issue and sell bonds therefor" (Stats. 1907, p. 666), and amendments thereto. Said act is commonly known as the Good Roads Act and future reference will be made to it as such.

The County Highway Commission's report and recommendation that bonds issue in the sum of $1,750,000 to be expended in the improvement and repairing of the highways of said county was adopted by the board of supervisors and subsequently ratified by the electors of said county at an election held for that purpose.

The report of the Highway Commission, as adopted by the board of supervisors, designated certain main highways, aggregating 124.42 miles, and divided said highway mileage into districts or sections. The court's attention in this proceeding is directed specifically to a certain selected portion of the main highway designated "No. 14, River Road." The full length of this section or division is 34.10 miles and the total cost of said improvements, as planned, was estimated to be $570,410. This sum has been set aside and is available for use. It is the complaint of the peti-

50 Cal. App.—42

tioner, who is a resident and taxpayer of said Sacramento County, and an owner of real property abutting on the highway to be improved in said "River Road" district, that respondents, who constitute the County Highway Commission of said county, have refused and still refuse to proceed to "initiate proceedings to prepare detailed specifications, plans and profiles for the improving" of a portion of the public highway included in said "River Road" district or section, and described in said petition, notwithstanding demand made by petitioner on said commission on June 15, 1920, to comply with the mandate of the statute.

The language of the act with which compliance is sought by the aid of a peremptory writ of mandate is as follows:

"Sec. 9. The doing of the work for which said bonds are issued shall be under the supervision and direction of the highway commission; *provided* that the final acceptance thereof shall be by the board of supervisors. As soon as the funds raised by the sale of said bonds are in the treasury the commission shall proceed to prepare detailed specifications, plans and profiles for the work to be done, or for such parts of it as they deem it advisable to have done separately, if they have not already done so, and for this purpose they may hire assistants, with the consent of the board of supervisors; and they shall then present said specifications, plans and profiles, with their recommendations in regard to the doing of the work and letting of contracts to the board of supervisors, who shall either adopt or reject the same as presented. If the board adopt the same they shall thereupon advertise for bids for doing the said work, or any part thereof which the highway commission recommend should be done separately, in accordance with said plans, profiles and specifications, by publishing a notice for ten days in a daily newspaper or two weeks in a weekly newspaper published at the county seat. . . . "

It further provides that the board may authorize the Highway Commission to make contracts without advertisement for any part of said work, the cost of which does not exceed $1,000. Aside from mandatory duties expressly imposed upon said commission, the board of supervisors may, at its discretion delegate to it other duties.

[1] It will be observed that section 9 of said act requires the Highway Commission to proceed to prepare detailed specifications, plans, and profiles for the *work to be done,* or for such parts of it as the commission deems it advisable to have done separately. The *work* to be done means, of course, the *whole* work. The commission may, it is true, in its discretion, have parts of it done separately. Petitioner, as a matter of fact, has made for the commission a selection of the part or portion which he would compel the commission to act upon. To compel the making of specifications, etc., as selected by petitioner, for the portion of the work described in the petition would destroy the right of the commission to exercise the discretion given by statute. [2] While *mandamus* may be invoked to compel the exercise of discretion, it cannot compel such discretion to be exercised in any particular way. (26 Cyc. 160.)

The regularity of the proceedings leading up to the refusal or failure of said Highway Commission to act as demanded is admitted. The *initiation* of the work by the Highway Commission by preparing detailed specifications, plans, and profiles for the improvement of a designated *portion* of said ''River Road'' is all that petitioner seeks. The performance of other duties necessary to a completion of the work which are or by direction of the board of supervisors may be cast upon the commission is not sought.

Without considering whether an attempt to merely compel the ''initiation of the work'' falls within the rule laid down in *Boyne* v. *Ryan,* 100 Cal. 265, [34 Pac. 707], and carried forward in later decisions, the question will be discussed on equitable principles.

The general courses of the highway as described in the petition follow the easterly bank of the Sacramento river. The crown of the reclamation levee constructed to shut out overflow waters from said river furnishes a base for the roadbed. In its original state and before the construction of any levees the area now covered by the base of said levee formed the roadbed. As the levee was raised from time to time to greater heights the roadbed, of course, was correspondingly elevated. When changed the highway followed the levee. The levee served a dual purpose and has

since been thus jointly used. Such use is common in areas subject to overflow.

It is the admission of petitioner that the levee which the highway now traverses "has never been raised nor constructed to conform to the standards heretofore adopted by the reclamation board of the state of California, and does not now conform to the standards fixed by said reclamation board."

[3] The purpose of the Good Roads Act is, unquestionably, to obtain roads of a durable or permanent character and thereby prevent a waste of public funds by inefficient road construction. Its requirements are, therefore, that all main highways to be constructed and all improvements to be made by virtue of its provisions shall be of a "durable and lasting character." Permanency or durability of construction does not mean in the sense used in the statute, as contended for by petitioner, merely impregnability to any sort of an attack that may be made upon the work. These terms have, however, a well-understood meaning in the public mind and in the minds of those engaged in the construction of roads adequate to meet the requirements of modern vehicle traffic. A highway subject to be inundated by flood waters during the period of its greatest need or likely to be overlaid with great depths of earth in the execution of state or federal authority, or rendered inaccessible from inevitable cause, would not be such a road as the act contemplates. Durability and lasting character must be considered in reference to availability for public travel and general road purposes. The character of the materials used in the construction of a durable roadbed would amount to nothing if it was to become overlaid with masses of earthen material to the extent that it is rendered inaccessible.

The highway described in the petition lies, as above stated, in a vast drainage district known as the "Sacramento and San Joaquin Drainage District." The controlling jurisdiction of the state reclamation board over the same in order to carry into effect the plans of the California Debris Commission for the control of the flood waters of the Sacramento and San Joaquin Rivers and their tributaries is fully defined in *Gray* v. *Reclamation Dist. No. 1500*, 174 Cal. 622, [163 Pac. 1024]. It is there de-

clared to possess very plenary powers. The power of reclaiming swamp and overflowed lands being in the lawful exercise of the police powers of the land is one of the most essential powers of government, one that is the least limitable. It is further said that the navigability of the Sacramento River is inextricably associated with flood control conditions. Upon these matters the nation and state are acting not only in harmony, but, it may be fairly said, under contract. (*Gray* v. *Reclamation Dist. No. 1500, supra.*) The report of the California Debris Commission, known as House Document No. 81 of the 62d Congress, has been approved by the statutes of this state as the plan and, in fact, forms the basis of the Sacramento Valley flood control plan and the state reclamation board act. This report fixes the standard for the levees of the Sacramento River south of the city of Sacramento at a required height of three feet above the adopted flood plane, 23.5 feet at the head of Grand Island and 35 feet at American River. The crown-width, slopes, grades, etc., are standardized. Levees already constructed are subject to reconstruction and realignment. Where physical conditions require it the river is to be widened, and, of course, this means that levees in such cases are to be entirely rebuilt. The so-called "maximum assumed flood plane" as part of the plan of flood control is founded upon experience and exhaustive engineering investigation by experts of the highest skill and has the sanction and approval of both national and state governments. It cannot be presumed that momentous plans thus adopted will be readily changed. It at least possesses some of the inherent qualities of permanency. Whatever uncertainty, if any, that may attend the permanency of the flood plane as now fixed is overshadowed by the certainty that the levees upon which the roadbed now rests must be raised beyond the present height. . Also changes in placement, realignments, and a number of other requirements are pointed out in an official notice given by L. H. Rand, colonel, corps of engineers, executive officer of the California Debris Commission, to the state reclamation board, dated July 12, 1918. The date set for the completion of this work is December 1, 1922.

[4] "The reports of the California Debris Commission and of state engineers have been adopted by state statutes.

This court takes judicial notice of them. . . . In addition to this, the history of the state, its topographical and its general conditions, including notorious facts concerning its rivers, are all matters of judicial notice." (*Gray* v. *Reclamation Dist. No. 1500, supra.*) Courts will take judicial notice of the public and private official acts of the legislative, executive, and judicial departments of this state and of the United States. (Subd. 3, sec. 1875, Code Civ. Proc.)

Governor William D. Stephens, as the executive head of this state, and the department of the Secretary of War of the United States have, for several years past, been joined in earnest co-operation in an effort to carry forward the plans of the California Debris Commission and the several flood control acts affecting the Sacramento River. To this end vast sums of money have been raised and expended by both state and nation in promotion of the project. The state has declared through its legislative voice that the "State of California and the people thereof are hereby declared to have a primary and supreme interest in having erected, maintained and protected on the banks of the Sacramento River . . . good and sufficient levees and embankments or other works of reclamation adequately protecting the lands overflowed by said streams," etc. (Stats. 1913, p. 252.) The governor of the state in a public document, dated June 19, 1917, and addressed to the Secretary of War, says: "The state is bound, therefore, in honor, by legislative enactment and by her own interest as well to carry out the terms of the contract, and the provisions (a), (b) and (c) of the flood control act, quoted in your letter are included in the obligation imposed upon her."

Provision (c) above referred to contains the requirement of the California Debris Commission (which has been expressly adopted by the legislature) that said levees shall be constructed to such grade and section and within such time as may be required by said commission. The day fixed for the completion of said work is December 1, 1922. It is to be presumed that the Governor will insist by messages to the legislature and through other official channels that the statutory agreements of the state with the federal government be complied with. Unquestionably it is to be presumed that the legislature will provide the ways and

means and that both branches of the state government, its executive and legislative, will co-operate in redeeming through specially created agencies, the solemn obligations of the state, which are surely in accord with our declared legislative policy. If this be done the levees upon which the proposed durable main highway is to be constructed will, beyond doubt, be raised, with probable necessary realignments occurring, and it is likely to be otherwise disturbed. If the work contemplated be now forced a waste of public funds would inevitably follow. Surely no contention is made that the writ of mandate may be employed to compel such result. Neither is it to be employed to accomplish a useless or vain thing.

Petitioner's claim is that the Highway Commission has taken no step to "prepare detailed specifications, plans and profiles," a preliminary prerequisite for the completion of the improvements. The work, indeed, must therefore stand still until detailed specifications, plans, etc., are prepared by the Highway Commission, and it should be compelled to act unless it can find legal justification in so refusing.

It must be presumed that the statutes and the well-defined policy of the state will be carried out and that said levees will be raised to prescribed heights and realigned or reconstructed or set farther away from the river banks as necessity or safety shall require.

[5] The work of preparing detailed specifications, plans, and profiles for the improvement of the highway would doubtless be done at a considerable cost. After such preparation it is quite certain that they would prove to be valueless for any purpose. The elements necessary for a calculative basis would be exceedingly uncertain, if not wholly lacking. Without knowledge of the full details concerning the proposed levees; including height and width to be added to the present levees, realignments to be made, and a score of other important details, a reasonably accurate knowledge of which would be essential for an intelligent result, the demanded specifications, plans, and profiles would necessarily be founded on speculation and vagaries and of no practical value. For the Highway Commission to prepare its specifications it must first know in detail what the state is to require in its levee construction. While the

general course of the road was described by the commission in its adopted plan, there could be no very serious legal objection, as suggested by petitioner, to slight departures therefrom made necessary to obtain practical and economic results. A substantial compliance is all that the law would require in this respect. It is not beyond hope that the same co-operation that has heretofore existed between levee builder and road builder will continue. There can be no doubt but that the whole plan of highway improvement was formed and adopted on the theory that the moneys raised by the issuance and sale of bonds was to be only applied and used, except in a few minor instances, in constructing durable roadbeds. It was but a fair and natural presumption that the levees as now constructed, or hereafter to be raised, would furnish support for the finished roadbed or pavement surface. There was no reason for the electors of the county who voted on the issuance of bonds to believe that the general custom of the county would be departed from in this particular instance. The amount of money provided to meet the cost of the proposed improvements refutes a contrary theory. Levees are ordinarily constructed at the expense of the land owners who are benefited therefrom. It scarcely requires the aid of testimony to show that $570,410 would not construct 34.10 miles of durable roadway upon embankments or levees to be erected at a safe height above flood plane and in addition build expensive bridges across broad streams. Petitioner does not claim that it will. He only insists that the fund provided is sufficient to build a durable road and argues that a durable road is one that possesses from the character of the material used in its construction inherent wearing strength or durability. Inferentially, however, the highway is to be built on the present levee grade, which is below the flood plane.

The petition is silent as to whether the rights of way to be secured by Sacramento County, as shown by the report of the Highway Commission, over the lands of certain named private land owners which lie within the "River Road" section have yet been acquired; and also as to the result of the proposed joint construction by the supervisors of Sacramento and Solano Counties of a bridge across the Sacramento River at Rio Vista.

The argument that the highway having been established before any levee was built and that the dominant easement therefore goes with it for highway purposes, and that this right cannot be lost except by direct provision of the legislature that it be subject to uses for reclamation purposes or unless taken by condemnation proceedings, is not important in the light of the facts presented by the issues. The writ of mandate may not be employed to aid in the unnecessary or wanton destruction of property, even though its loss may be made whole to the owner. Equity abhors wanton waste. The reasonable certainty that a durable highway constructed upon the levee at its present grade would within a reasonable period become inextricably lost or rendered inaccessible for use would be a sufficient reason for a denial of the writ.

The road construction cases cited by petitioner are not wholly in point here. The obstacles to be overcome in those cases were the natural incidents to the building of roads in the particular localities in which they were constructed and were obviously within the contemplation of their projectors. Cuts or tunnels through mountains or causeways across swamps and morasses are difficulties to be surmounted in districts in which they are known to exist. Such difficulties are quite patent, however, and are always reckoned with in such projects of construction. In the instant case, however, the facts are different. Here it would be but natural to suppose that the levee, if raised to a height to insure safety against overflow, would be so raised at the expense of the land owners and others di-. rectly benefited thereby; secondly, if not raised it would still serve reasonably well as a subgrade for the highway as it had served for many years past. Its height was sufficient as a roadbed, but insufficient for levee purposes.

"The writ of *mandamus* is not wholly a writ of right but lies to a considerable extent within the sound judicial discretion of the court where the application is made; and no court should allow a writ of *mandamus* to compel a technical compliance with the letter of the law, where such compliance will violate the spirit of the law. . . . The writ of mandate should not be used to wrongfully wrest a statute from its true purpose." (*Wiedwald* v. *Dodson,* 95 Cal. 450, [30 Pac. 580].)

A well-known principle of law is announced in *State ex rel. Southern New England Tel. Co.* v. *Towers,* 71 Conn. 657, [42 Atl. 1083], to the effect that where the city council had in contemplation and under consideration a plan to be worked out within a reasonable period of time that would change an established system of stringing telephonic, telegraphic, fire-alarm and electric light wires to a new and improved system, a writ of mandate would not lie to compel the street commissioner to grant permission to a telephone company to lay wires under the old system, although the right was absolute and would have been compelled but for the contemplated change. This is surely a sound principle of equity and has its application to the instant case.

It is the claim of respondent that the only interest that petitioner has in this proceeding that may be differentiated from the interest of any other taxpayer of the county is an ulterior interest of profit by shifting a burden that belongs to him and his associates to those who would not otherwise be called upon to contribute to the construction of levees for the protection of himself and other abutting land owners. It is true that petitioner's legal grievance is not greater than that common to other taxpayers of the county. He is not denied a privilege by delay that he had ever enjoyed. The means of egress and ingress to his property remain unchanged and no complaint is made as to its adequacy. If the levee is raised to the flood height at the expense of the bond fund, it will directly relieve him of a burden that would otherwise be his. As a matter of law, he cannot be said to be any more beneficially interested in the improvement of the designated portion of the highway sought to be improved than in any other part, or the whole thereof, or than any other citizen taxpayer should be.

The delay complained of has not lagged beyond state highway construction or similar public work in other counties of the state. The Highway Commission, by resolution, as shown by the petition, gave as a reason for not acting as demanded the failure of petitioners themselves to comply with the requirements of the state reclamation board and to bring the river levee up to the prescribed grade. This much is admitted.

It is not charged that the Highway Commission has in anywise acted contumaciously. It has declined only to act until such time as it may be able to proceed efficiently.

It is a matter of record and a notorious fact that the reclamation board is at the present time through the state department of engineering completing surveys such as are necessary for the adoption of a definite project to follow the requirements of the California Debris Commission, which shall include the east levee of the Sacramento River south from the city of Sacramento. The work will doubtless be carried forward with such acceleration as is consistent with the magnitude of the project.

The right to the issuance of the writ of mandate is largely within the discretion of the court. Much that has been said here is directed to the discretionary powers of the court. There appears, however, sufficient equitable reasons for denying the petition. It is ordered, therefore, that the demurrer be sustained and the petition dismissed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 24, 1920.

All the Justices concurred except Wilbur, J., who voted for granting of petition.