[Sac. No. 4290. In Bank.—February 25, 1931.]

SUTRO HEIGHTS LAND COMPANY (a Corporation) et al., Appellants, v. MERCED IRRIGATION DISTRICT (a Public Corporation), Respondent.

Hatfield, Wood & Kilkenny and Treadwell, Van Fleet & Laughlin for Appellants.

Downey, Brand & Seymour, A. L. Cowell and Stephen W. Downey for Respondent.

CURTIS, J.—The complaint in this action asks for an injunction against the defendant prohibiting it from permitting water to flow or seep through its canals upon plaintiffs' lands; for the abatement thereof as a nuisance, and for damages alleged to have been already sustained by reason of seepage of water upon plaintiffs' said lands. By a separate cause of action plaintiffs also ask that defendant be compelled to install a drainage system for the purpose of relieving plaintiffs' lands from the water which the plaintiffs allege has been caused to flow thereon through seepage from the canals of the defendant.

Plaintiffs allege in their complaint that they are the owners in severalty of three tracts of land, being parts of a tract of land formerly owned by Louis Titus and commonly known as the Titus ranch, all of which last-named tract, except the southwest quarter of section 18, township 7 south, range 11 east, M. D. B. & M., lies within and is a part of the Merced Irrigation District. The lands of the plaintiffs are practically contiguous and are in the extreme southwest portion of the district and comprise 2,500 acres or thereabouts.

The defendant is an irrigation district organized under the general Irrigation Act of 1897 (Stats. 1897, p. 254) and acts amendatory thereof. It comprises about 180,000 acres of land and is situated in the county of Merced.

In their complaint the plaintiffs allege that the defendant, the Merced Irrigation District, during the year 1922 constructed certain canals over and upon the lands of plaintiffs and particularly a certain canal known as the McCoy canal, the McCoy spillway, the Arena canal or spillway, and certain branches thereof, for the purpose of the carriage of water for the irrigation of the land within the said district, and also for the purpose of spilling the surplus water in the canals of said district into certain natural and artificial drainage beyond the boundaries of said district. The complaint then continues and it is alleged therein:

"That the said land of the plaintiffs is extremely sandy in character and the canals so constructed and operated by the said district were and are likewise constructed through land of loose, sandy nature, and the said district constructed the said canals with banks made entirely of loose, sandy material, and so constructed the said canals that the banks were raised extremely high and the water in said canals was carried above the natural surface of the ground and against the loose, sandy banks of said canals, and ever since said time the said defendant has carelessly and negligently, and entirely disregarding the rights of the plaintiffs, maintained and operated the said canals so constructed in such a careless and negligent manner, and has carried water in the said canals and above the natural surface of the said ground and against the said sandy banks of said canals, and has carelessly and negligently permitted the said water to escape from the said canals and through the sandy banks thereof and to flow in large quantities outside of the said canals and through, over and upon the said lands of the plaintiffs, and to seep through the said banks in large quantities, and into and under the lands of the said plaintiffs; and the said defendant has carelessly and negligently failed to in any way control the said water or to confine the same within the said canals and has carelessly and negligently failed to properly line the said canals or to otherwise prevent the same from flowing and seeping out of the same, as aforesaid, and as a result thereof large quantities of water have so flowed and seeped out of the said canals and formed lakes and ponds upon the surface of the said lands of plaintiffs, and raised the water table in the said lands in other places on the same so near to the surface as to water-log the same and destroy the same for the growth of crops to which the same were otherwise adapted, and so as to kill and destroy the crops already growing thereon, and so as to make the said lands utterly unfit for agricultural purposes.

"That the said defendant still maintains and operates the said canals and threatens to continue to maintain and operate the same and threatens to continue to carry large quantities of water through the said canals, and to carry the same against the said sandy banks of the said canals, and threatens to and will, unless enjoined by this court,

continue to permit the same to seep and flow out of the said canals and through the banks thereof and into, over and upon the said land of the plaintiffs and to still further flood and water-log the said land and raise the water table under the same; and the said trespasses of the said defendant are and will be continuous and will gradually entirely destroy the said property, and the whole thereof, and render the same entirely unfit for agricultural purposes, and will prevent the said plaintiffs from growing any crops whatsoever upon the same, and will also cause noxious growths upon the same, and will cause salts to accumulate upon the surface thereof, permanently injuring and destroying the same; and the said acts of the defendant interfere with the comfortable use and enjoyment of the said property and constitute a nuisance and a continuing trespass thereon.''

Then follow allegations as to the damage sustained by the respective plaintiffs.

To these allegations the defendant made certain denials and admissions. It also set up a number of affirmative defenses and pleaded the statute of limitations. Upon the issues thus made by the pleadings the case went to trial and at the conclusion of the evidence the trial court made and filed its findings of fact pursuant to the issues made by said complaint and the amended answer thereto including the affirmative defenses of the defendant. These findings are voluminous and are entirely too lengthy to be set forth in full herein. They are in favor of the defendant on every issue made by the pleadings, with one apparent exception, which we will later mention. The court found that for more than ten years prior to the year 1922 the Crocker-Huffman Land & Water Company had owned an extensive canal system in said county and as early as 1913 with the knowledge and acquiescence of the predecessors in interest of the plaintiffs they had constructed a certain canal known as the Arena spillway as a part of their canal system. In January, 1922, the defendant district purchased from the Crocker-Huffman Land & Water Company its said canal system including said Arena spillway and has continued to and is now using said system as it was used prior to its purchase by defendant. That the predecessors in interest of plaintiffs owned in one tract the said lands through which said Arena spillway was constructed and the lands now owned by the

plaintiffs, and described in their complaint, from a date prior to 1910 continuously to the year 1921, and knew of the character of the land through which said Arena spillway canal was constructed and the manner of its construction and use, and acquiesced therein and controlled the water therein and diverted water therefrom and used the water so diverted during all of said period of time. That after the purchase by the defendant district of the Crocker-Huffman Company, said district constructed in August, 1922, a portion of the McCoy canal; between March 1st and August 1st of the same year the district constructed a canal known as the Stockman canal through the lands of the plaintiffs; between March 1 and July 10, 1923, the district constructed a canal known as the McCoy extension from the end of the McCoy canal through certain portions of plaintiffs' lands. During the same period of time the district constructed certain laterals leading from said canals on and across the lands of the plaintiffs, also the Arena relocation, a portion of which was constructed on and through the lands of the plaintiffs. These canals and laterals were, and each of them was, so constructed for permanent use of the district, in the manner and place, and with full knowledge and acquiescence, and at the request and upon the urge of the plaintiffs and the then owners of the land over which the same respectively were constructed, and the manner of use and intended use by defendant of each of said water conduits was at all times known to the plaintiffs, and plaintiffs have at all times demanded and insisted upon the use of said canals and laterals for the delivery by defendant, as such irrigation district, of water for irrigation purposes to their respective lands. "That the said plaintiffs at all times knew of the character of the soil, as to being loose or close in texture, through which each of said conduits was so constructed and the nature of the banks and bottom of each of said conduits and of their resistance to water flowing in said conduit, and said plaintiffs and all persons owning the land through which said conduits and each of them were built knew that defendant intended to use permanently for the public use of said district, each of said conduits as so constructed as a part of its distributing system of canals to distribute water for irrigation of land in said defendant district, including the lands described in plaintiffs' complaint, and the said defendant

has with the knowledge of plaintiffs and each of them since the construction of each of said conduits, respectively, continuously, uninterruptedly, notoriously, adversely and with the acquiescence of the plaintiffs, and each of them, and under a claim of right against the whole world, used the said conduits as a part of the distributing system of canals to distribute water for irrigation of land in said defendant district, including the lands described in plaintiffs' complaint, and the service of the public use to serve which said defendant was organized, and the said conduits and each of them were at the time of their construction and at all times, necessary to said public use for which said defendant was organized and necessary in order that the said defendant could supply water with which to irrigate the lands within the boundaries of said district including the said land described in the plaintiffs' complaint, all of which facts were at all times herein mentioned known to the plaintiffs.

''That it is not true that the land described in said complaint is extremely sandy in character nor that it is any more sandy in character than many more large areas in defendant district and in other portions of the State of California, and particularly in the San Joaquin Valley in said state, which are and for many years have been irrigated by means of canals constructed of the same kind of material and located in the same manner as the canals constructed by defendant as aforesaid. That it is true that the said canals were constructed of the material of the soil through which said canals were built, and that such canals are commonly and usually built through such material in the San Joaquin Valley and that it would not have been practicable or feasible to have built or operated said canals otherwise than as the said canals were built and used as aforesaid. That it is not true that defendant so constructed said canals, or any of them, that the banks thereof were raised extremely high or any higher than was necessary to provide in a reasonable and customary and proper manner for the irrigation of the lands to be irrigated from said canals, including the said lands described in said complaint, or any higher than is usual and proper in construction of canals in and through lands of the character of the lands described in said complaint. That it is true that the lands described in said com-

plaint are portions of a certain tract of land formerly owned by Louis Titus and commonly called the Titus ranch, comprising the land shown on the map attached to defendant's answer as being subdivided into lots designated by numbers enclosed in circles; that all of said tract except the southwest quarter of section 18 is, and ever since the 8th day of December, 1919, has been within and a part of the Merced Irrigation District; that said tract has a general slope from northeast to southwest, but has an undulating surface and consists of a series of ridges and swales of varying width; that said ridges and swales do not run in a uniform direction and are not continuous lengthwise across said tract, but said swales are of spoonlike or saucerlike formation so that water accumulating therein cannot escape therefrom except by evaporation or sinking into the soil, and said ridges are broken in certain places by depressions or are crossed by certain of said swales; that in order to provide for the irrigation of as much of said tract as practicable, including the lands described in said complaint, it was necessary to, and defendant did, with the acquiescence of plaintiffs and each of them, construct said canals along certain of said ridges except where it was necessary to cross certain of said depressions or certain of said swales, or to follow or to run on lot lines or approximately parallel to lot lines, and at such places it was necessary to, and defendant did, with the acquiescence of plaintiffs, construct fills to carry said canals across said depressions or said swales, and defendant, at the request of plaintiffs, did change locations so as to run on lot lines or approximately parallel to lot lines. That it is not true that the water in said canals was or has been or is carried above the natural surface of the ground except where said water was so carried with the acquiescence or at the request of plaintiffs and where it was and is necessary so to do in order to convey water across the depressions or the swales crossed by said canals as aforesaid.''

The court then finds that the defendant has never carelessly or negligently maintained or operated said canals and laterals located upon plaintiffs' lands, nor has it carelessly or negligently permitted any water to escape from said canals or laterals nor to drain or seep through the banks of said canals or laterals upon the lands of the plaintiffs.

Continuing, the court finds: ''That it is not true that as a result of any unlawful or improper acts of defendant, or as a result of the omission of any duty or duties of the defendant, large quantities or any quantities of water have flowed or seeped out of any canal or canals of the defendant and formed lakes or ponds upon the surface of the lands described in said complaint, or any of said lands or raised the water table in said lands, or any of them, in other places on the same, or at all, so near the surface as to water-log the same or to water-log any of said lands or destroy the same for the growth of crops to which the same were otherwise adapted, or so as to kill or destroy the crops already growing thereon, or any crops, or so as to make said lands, or any of them, utterly, or at all unfit for agricultural purposes.''

A further finding of the court was to the effect that said canals and laterals were designed and constructed in a workmanlike manner, with due care, skill and prudence and in accordance with plans properly drawn and such as are customarily and usually adopted for the construction· of canals through lands of the nature and topography of said Titus ranch for the irrigation thereof; and that the seepage from said canals has been only in such quantities as is usual and unavoidable from canals constructed as aforesaid in and through lands of the nature and topography of the Titus ranch.

As accounting at least in part for the high-water plane under the lands of the plaintiffs the court found that during the years from 1922 to 1926 large quantities of water delivered upon the Titus ranch for irrigation purposes had seeped and percolated through and from said lands so irrigated into the ground water in and under said Titus ranch, and that many of the persons to whom said water was delivered for irrigation purposes, carelessly and negligently caused and allowed large portions of the water so delivered to them in certain of said years to run into certain swales or depressions and accumulate therein, thus causing the ground water in and under said Titus ranch to rise during the spring and summer of each of said years; furthermore, that plaintiffs' lands are underlaid with a thick layer of impervious material known as hard-pan at a depth of from six inches to two feet below the bottoms of some of the

swales and depressions, and at a depth of from six inches to four feet below the surface of much of the remainder of said land; that due to the location of the Titus ranch being lower in elevation than the lands to the north and east thereof, water used in irrigating the higher lands, or at least a considerable portion thereof, seeps and flows down to the lands of the plaintiffs, and thereby causes the water plane, underlying said lands, to rise and stand at a higher level than it otherwise would, especially during the spring and summer months of each year, and that the use of water for irrigation in said territory to the eastward and northeastward of Titus ranch has continued and increased each year from and since the year 1922, and that as a result thereof the flow of ground water to and into the lands of the plaintiffs has continued as aforesaid, except as said ground water has been controlled by the defendant, as set forth in other portions of said findings. As a further reason for the rise of the water underlying plaintiffs' said lands, the court found that during the year 1892 the then owner of section 9, township 7 south, range 11 east, described in the complaint, being a portion of the lands now owned by one of the plaintiffs, sunk an artesian well about 300 feet deep near the center of said section 9 and developed from said well a large flow of water, and ever since said time said artesian water has been permitted to flow from said well and has maintained a large lake in the depression surrounding said well; that the water from said well is strongly impregnated with alkali, and ever since said year 1892 the water from said well has seeped and percolated into the soil westward from said well. As this well is located near the easterly boundary line of the Titus ranch, the seepage therefrom would extend into the soil of a large portion of said ranch.

As a final finding on this phase of the case, the court found that defendant had not damaged the lands of the plaintiffs, or the lands of any of said plaintiffs in the particulars set forth in plaintiffs' complaint, or in any of said particulars, or in any other manner, or in any amount, or at all.

In response to certain of the affirmative defenses interposed by the defendant, the court found that the plaintiffs and their predecessors in interest had executed and delivered

the following conveyances to rights of way over and across the land dscribed in plaintiffs' complaint, for the construction, maintenance and operation of canals and laterals for the purpose of conveying water for irrigation purposes:

1. Agreement between John W. Mitchell and the Merced Canal Irrigation Company, dated May 21, 1885, whereby the said John W. Mitchell purported to grant to said company, its successors and assigns, the right of way for the purpose of constructing ditches, canals, flumes, pipes and conveyances for water through and across all of the lands described in said agreement, which said lands include the lands described in the complaint as belonging to the plaintiffs. As this agreement contains direct words of grant it will be referred to hereafter as a deed.

2. Deed from East Side Investment Company, dated April 24, 1922, to Merced Irrigation District, a right of way sixty feet in width for the construction of the McCoy canal, and right of way fifty feet in width for the construction of the Stockman canal over portions of the lands of the plaintiffs and substantially along the routes of said canals as they were subsequently constructed over the land described in said deed.

3. Deed between said parties of the same date, of right of way fifty feet in width for the Stockman canal over other lands, now owned by the plaintiffs and described in the complaint, on a portion of which the said Stockman canal was subsequently constructed and is now maintained.

4. Deed from Lyon & Hoag, a corporation, one of the plaintiffs herein to the Merced Irrigation District, dated May 3, 1922, of a right of way fifty feet in width for portion of Stockman canal as the same was subsequently constructed over a part of the land described in the complaint.

Upon the question of the statute of limitations set up in the defendant's amended answer the court found that each and every cause of action stated in the complaint was barred by the provisions of subdivisions 1 and 2 of section 338, and subdivision 1 of section 339 of the Code of Civil Procedure.

As before noted, the court apparently found in favor of plaintiffs as to one of the issues made by the pleadings. This finding is found in paragraph XVIII of the findings. We are satisfied that there is a clerical error in this finding as it appears in the record before us, in that

the word "not" in the first line of said finding was inadvertently placed therein when said findings were prepared. Each of the parties herein agrees that such is the fact. Under our power to make findings, we undoubtedly have the authority to correct an error appearing in the findings, so that they will conform to the evidence as shown by the record. Finding XVIII is therefore corrected by striking out the word "not" in the first line thereof, and as corrected said finding is hereby made the finding of the court. It is as follows:

"That it is true that during the years 1921 and 1922 the plaintiffs herein and each of them represented repeatedly to defendant that they respectively were interested in certain portions of that certain tract of land known as the Titus ranch, and shown on the map attached to defendant's answer and marked 'Exhibit "A"', including the lands described in said complaint, and the plaintiffs repeatedly urged, and each of them repeatedly urged, defendant to hasten the construction of canals to and through said Titus ranch to provide water for the irrigation of all the lands therein which were included within defendant district; and said plaintiffs and each of them offered to and did cooperate with defendant in removing objections to defendant's use of the rights of way selected by defendant for certain of said canals; that plaintiffs and each of them at all times well knew that all the land in said Titus ranch was of a sandy nature and that said ranch contained numerous swales and depressions, and that the ground water in said Titus ranch was at all times near to and at certain times higher than the bottoms of certain of said swales and depressions; that plaintiffs and each of them knew the plans of defendant for the construction of said canals and of the necessity of constructing said canals with high banks across said swales and depressions in order that all of said land might be irrigated; that plaintiffs and each of them at all times knew that defendant had no funds with which to pay for lining any portions of said canals with concrete and would not have funds for that purpose for many years after the construction of said canals, and plaintiffs and each of them at all times well knew that defendant had planned a gradual development of a comprehensive system of drainage; that notwithstanding their knowledge of the facts aforesaid,

plaintiffs and each of them repeatedly urged defendant during the winter and spring of 1923 to complete certain canals constructed by defendant in said Titus ranch in the year 1922 for permanent use of defendant in supplying water for the irrigation of lands in said district, including the lands described in said complaint, and repeatedly urged defendant to hasten the delivery and continue the delivery of water in 1923 and 1924 through said canals as the same had been so constructed; that defendant, in response to said urgings of plaintiffs and each of them, did hasten the construction of said canals and the delivery of water to said lands, including the lands described in said complaint as urged and requested by plaintiffs, and did construct said canals as urged by the plaintiffs, at the places and in the manner so urged by plaintiffs, and by each of them, and with the soil through which said canals were constructed, and defendant believed, and was led by the aforesaid repeated urging of plaintiffs and each of them to believe, that the plaintiffs and each of them would consider that any damage that might be caused by the seeping or breaking of water from said canals would be necessary and incidental to the development of said Titus ranch by means of irrigation from said canals; that defendant would not have constructed said canals or any canals to said lands described in said complaint, and would not have constructed said canals with high banks across said swales and depressions except for said repeated urging of plaintiffs and each of them, and unless it had understood and believed that plaintiffs and each of them would consider the construction of said canals aforesaid as the full performance of defendant's duty to plaintiffs and to other owners of land to be irrigated from the said canals.''

Before passing to the consideration of the questions arising from the appeal from the judgment, denying plaintiffs' prayer for an injunction and damages, we will set forth the nature and character of plaintiffs' second cause of action, in which they ask for a mandatory injunction directing and commanding the defendant to forthwith construct and install suitable drainage works to drain the lands of the plaintiffs and to remove therefrom water brought thereon by the defendant.

In their second cause of action, the plaintiffs incorporate all of the allegations of the first cause of action and make them a part of their second cause of action. They then allege that one of the purposes for which the defendant was organized was that of supplying drainage to the lands within the district, and particularly lands which would require drainage on account of the irrigation carried on by the district and that all of plaintiffs' lands within the district are entitled to be supplied with drainage facilities; that the district has levied assessments and voted bonds in part for the construction of drainage works and has constructed numerous such works within the district; that it now has on hand certain funds available for that purpose; that the defendant has constructed no works for the drainage of plaintiffs' lands except one well which is inadequate, and that in order to restore plaintiffs' said lands to their natural condition and make them capable of growing crops, it will be necessary to line said canals with concrete, and construct and operate such wells as shall reduce the water table under all parts of plaintiffs' lands to a depth of at least ten feet below the surface of said lands, and to keep it at said level; that defendant will, unless enjoined by this court, apply said funds, available for drainage purposes and raised for that purpose, to other uses and purposes, thus depriving plaintiffs of the drainage facilities to which they are entitled; and that plaintiffs have demanded that defendant construct said drainage works, but defendant has refused said demand, except the one well mentioned above.

To the allegations contained in this cause of action, the defendant in its amended answer to the complaint made answer consisting of certain admissions and denials, and a further recitation of facts as to the drainage conditions existing in said district, and the efforts made by the defendant to remedy these conditions, and as the court's findings follow in all substantial respects the allegations of the answer, it will not be necessary to separately state these allegations, but we will pass to the findings of the court in response to the issues made by the pleadings in this cause of action. Preliminary to the statement of facts as found by the court, it might be well to state that the defendant admits that it is under obligation, in so far as the funds of the district will permit, to provide for drainage facilities

for all lands within the district, which are in need of drainage by reason of the irrigation operations of the district. The court found that immediately after its organization, the defendant during the years 1920, 1921 and 1922 caused studies and investigations to be made in order to formulate a comprehensive plan for the control of ground water and the drainage of lands of the district injuriously affected thereby; that such a plan was adopted and in pursuance thereof defendant purchased certain drainage canals and works theretofore constructed, and installed within the district thirty-five drainage wells and pumping plants in such locations within the district as the drainage engineer of the district determined would be most effective in controlling the ground water and preventing its flow into and upon the lands in the westerly and southwesterly portions of the district. These wells and pumping plants were installed prior to the thirty-first day of March, 1924, and were operated during the irrigation season of 1924 and thereafter. Six additional wells and pumping plants were installed during the seasons of 1925 and 1926, and fourteen during the following season, all located to the eastward and northeastward of the lands of plaintiffs and so located in the judgment of the board of directors of the defendant and of its engineers as to be most effective in controlling the ground water within the district and to prevent the flow of as much thereof as possible toward the lands in the westerly and southwesterly portions of the district; that up to September 30, 1926 (the complaint in this action was filed October 26, 1926), the district had expended in carrying out its drainage plans the sum of $495,978.63. During the following year, the district spent for the same purpose $172,561.13, and its budget for the year beginning September 30, 1927, contains estimated items of expenditure in the sum of $288,048.24 for drainage purposes and lining of canals. The amount of $495,978.63 mentioned above includes the sum of $130,000 for canal lining; and the item of $172,561.13, expended for drainage purposes during the year ending September 30, 1927, includes $40,000 paid out for canal lining.

Then follows the following finding: "That all drainage pumping plants have been operated since their installation whenever necessary for the control of ground water; that

thereby great quantities of water have been prevented from flowing into the lands described in the complaint, and if it should be considered and determined by the board of directors of defendant district that for the best interests of said district further drainage works than as aforesaid are required, defendant will, as funds can be obtained from time to time for that purpose, install additional drainage works or adopt other practicable means of controlling the ground water in the district, to such an extent as may be practicable, fair and equitable, and for the best interests of said district, everything considered.''

A further finding of the court is to the effect that none of the lands of the plaintiffs are entitled to be supplied by defendant with facilities for drainage, except such facilities as may from time to time be found necessary by the board of directors of the defendant in pursuance of the comprehensive plan for the control of ground water adopted by the district; that the district had on hand at the commencement of this action no funds available for drainage purposes; that the district since the commencement of this action has raised no money for the purpose or available for drainage purposes, except such money as has been expended by the district for that purpose. In addition to the foregoing the court also made the following findings:

''That it is true that defendant has done all that it could reasonably and fairly and equitably do for the drainage of plaintiffs' said lands and the control of the ground water flowing therein and thereto, with the funds available for that purpose, and that the money heretofore expended by defendant for the control of ground water and canal lining as set forth was all the money that could have been fairly and equitably expended for that purpose.'' . . .

''That it is not true that defendant has refused to construct drainage works for the lands described in the complaint. That it is not true that defendant has constructed only one drainage well for the benefit of the land described in the complaint. That it is true that defendant has made provision for the drainage and protection of said lands in accordance with the best, fair and honest judgment of the board of directors and the necessities and funds of the district.''

Upon the findings thus made by the court, judgment was entered that plaintiffs take nothing by said action and that defendant recover its costs. From this judgment the plaintiffs have appealed.

The first attack upon the judgment is that the findings are not supported by the evidence. Some eight different assignments are stated in plaintiffs' brief in which they claim the evidence is insufficient. This statement is brief and does not attempt to do more than assign the grounds upon which plaintiffs rely in support of their contention that the evidence is insufficient.

■ Plaintiffs have not indicated in their brief any particular testimony on which they rely in support of their contention that the findings are not supported by the evidence, nor have they pointed out or attempted to, any lack, defect, or deficiency in the evidence on the part of the defendant which would render it subject to plaintiffs' attack. Plaintiffs' brief contains a comparatively short general *résumé* of the evidence without a single reference to the reporter's transcript and with the mention of the names of only three witnesses out of the forty or more witnesses who testified during the trial. In the place of an argument as to the facts of the case, the plaintiffs have inserted in their brief what purports to be the testimony in the case reduced to narrative form consisting of some 165 pages of closely printed matter, preceding it with the following statement: "The main facts in the case are all established by positive engineering testimony of both parties, and it is without any material conflict. We recognize the burden that we are required to place upon the court in asking it to review the findings, and we do not wish to do so on a mere argument as to the facts, and have, therefore, carefully reduced the testimony of the witnesses for both parties to narrative form and, with the *résumé* which we have already made of it, that testimony we deem the best answer to the findings in the case."

In such a case it is not the duty of the court to discover, even if it were able to do so, the particular evidence upon which the plaintiffs rely. On the other hand, the decisions of this court are to the effect that this burden is with the party assailing the finding. In *Duncan* v. *Ramish,* 142 Cal. 686, 689 [76 Pac. 661], where a like situation arose, the

court said: "It is claimed that the findings are in many particulars supported by the evidence. The greater number of these objections are not presented in a manner that will warrant us in noticing them. . . . The court and counsel for respondents are left to discover, if they can, the particular point upon which the evidence fails to support the respective findings. 'Under these circumstances we do not feel called upon to prosecute an independent inquiry in order to find out' in which respect the evidence is insufficient." In the case of *Brovelli* v. *Bianchi*, 136 Cal. 612 [69 Pac. 416], we find a similar statement of the law in the following language: "The first point made is, that the evidence does not support the findings. The evidence is not pointed out in the brief of appellant, and no suggestion made as to the respects wherein the evidence fails to support the findings or any finding. In such case we will not endeavor to discover the respects wherein the evidence is insufficient, but will presume that it supports every material finding of fact." Again this court in the case of *Kyle* v. *Craig*, 125 Cal. 107, 116 [57 Pac. 791], held as follows: "And even if the specifications in the assignments of error were sufficient, counsel has not pointed out in his brief and called to our attention the particular finding or findings claimed to have no support in the evidence, and the particulars in which such finding is not supported by the evidence. In such case, we do not deem it our duty to investigate the questions as to the insufficiency of the evidence." In Hayne on New Trial and Appeal, volume 2, Revised Edition, section 278, page 1544, we find the rule stated as follows: "And where briefs are filed it is the duty of counsel to present all that is material to the points involved. Thus in *Williston* v. *Perkins*, 51 Cal. 554, where the appellant's counsel in his brief made out a *prima facie* case of the insufficiency of the evidence to justify a finding of fact, and the respondent did not advert to the appellant's showing upon this point, the court modified the judgment, saying: 'If there be in the voluminous record on file any evidence going to support the findings in the respect referred to, the respondent should have pointed it out. It is not our business to institute a search to find it.' "

We feel that the language quoted from the foregoing authorities correctly states the situation in the present action.

If there is any evidence or lack of evidence in the record which will sustain plaintiffs' contention that the evidence is insufficient to support the findings, they should point out this evidence to the court rather than to present us a voluminous document, purporting to contain the evidence of both parties to the action, and require this court to sift out of this mass of testimony that which may support the contention of the plaintiffs. Furthermore, the narrative of the evidence as prepared by the plaintiffs does not, it is evident, contain all the evidence of both parties to the action. The defendant calls attention to the fact that there is omitted therefrom all the cross-examination of plaintiffs' witnesses, and by comparing it with the reporter's transcript it appears that the larger part of defendant's evidence has not been included in plaintiffs' statement of facts. In fact, while more than thirty witnesses testified on behalf of the defendant, the testimony of only two of these witnesses is contained in plaintiffs' statement.

It is true that these two witnesses were engineers and plaintiffs state in their brief that ''the facts in the case are all established by positive engineering testimony,'' but there is nothing to show the court, unless we review the entire typewritten record in the case, that at least some of the other twenty-eight witnesses who testified for defendant did not either give ''engineering testimony'' or testimony which, while not strictly of that nature, was of such weight and character as to have a material bearing upon many of the issues of the case. For these reasons we find ourselves at great disadvantage in reviewing the points made by the plaintiffs in respect to the insufficiency of the evidence to support the findings. We have, however, carefully gone over the narrative statement of the evidence prepared by the plaintiffs, with such other parts of the testimony as appear to have a material bearing upon the questions raised by plaintiffs' attack upon the findings.

Among other findings the court found that the plaintiffs were barred from relief, either equitable or legal, because they or their predecessors in interest had deeded rights of way for the canals as constructed on their lands, or had consented or acquiesced in the construction of said canals. Plaintiffs do not question the execution and delivery of the deeds heretofore mentioned nor that they were bound

by the terms thereof with possibly one exception, nor that substantially all of the canals constructed on their lands were constructed upon rights of way acquired by defendant through said conveyances. Plaintiffs do contend that the deed from John W. Mitchell to the Merced Canal and Irrigation Company is not of any binding effect upon them for the reason that its terms are so indefinite and uncertain as to render it void, and that it failed to specify any particular kind of canals that were to be constructed thereunder. We question whether either of these reasons constitute a valid objection to said deed. But leaving out of consideration the Mitchell deed, the two deeds from the East Side Investment Company, and the one from Lyon & Hoag cover rights of way for substantially all the canals constructed by defendant upon plaintiffs' lands. Besides these deeds the evidence shows without contradiction, and the plaintiffs so concede, that they consented to and acquiesced in the construction of all of said canals and laterals. At or about the time the defendant was constructing said canals, the plaintiffs were engaged in a selling campaign of their lands, which they had some time before divided into forty-acre tracts. It was necessary in order to sell the lands to any advantage to have water for the same, and the plaintiffs for some time before and while said canals were being constructed urged and even demanded that the defendant complete the construction of said canals at as early a date as possible so that plaintiffs could successfully wage their selling campaign. In fact, a statement appears in the record, which is not contradicted, that the plaintiffs brought an action against the defendant asking damages for the delay of defendant in the construction of certain of said canals. Having acquiesced in the construction of said canals, plaintiffs are now in no position to ask for an injunction prohibiting defendant from maintaining and operating them, nor to have the same abated as a nuisance.

The defendant, the Merced Irrigation District, is an agency of the state, and the use to which water owned and controlled by it is put is a public use. The law is too well established in this state to require any extended citation of authorities that where the owner of property acquiesces in, or even stands by and makes no suitable objection to, its use for a public purpose, he cannot thereafter enjoin the con-

tinuance of such public use. The latest case upon this subject is *Conaway* v. *Yolo Water & Power Co.*, 204 Cal. 125 [58 A. L. R. 674, 266 Pac. 944], in which this court said: "Where property is taken for a public use by a public service corporation and the owner of the property has not in an appropriate way objected to its being so taken, but has, by silence and acquiescence, permitted the public use to be inaugurated and carried on for some period of time, he has thus waived or lost his right to proceed against such use of his property by ejectment or abatement." Other cases enunciating the same rule are: *Reed* v. *Oakdale Irr. Dist.*, 46 Cal. App. 139, 142 [188 Pac. 832], *Barton* v. *Riverside Water Co.*, 155 Cal. 509, 515 [23 L. R. A. (N. S.) 331, 101 Pac. 790], *Miller & Lux* v. *Enterprise Canal & Land Co.*, 169 Cal. 415, 423 [147 Pac. 567], and *Gurnsey* v. *Northern California Power Co.*, 160 Cal. 699, 711 [36 L. R. A. (N. S.) 185, 117 Pac. 906]. If mere acquiescence in the use of private land by a public corporation will work a waiver of a property owner's right to enjoin such use, the rule should be much more strictly drawn against one who has not only acquiesced but has expressly consented and urged and importuned the taking of his land for such public use. In neither case will an injunction lie against such use of his property, nor will the court abate the use thereof as a nuisance.

In the case of *Conaway* v. *Yolo Water & Power Co.*, *supra*, it was held that: "In such case, if he has suffered damage to his property . . . he is, of course, entitled to be compensated in damages." This brings us to a consideration of the question of damages which the plaintiffs contend they are entitled to by reason of the maintenance and operation of said canals upon their lands. Are the plaintiffs barred from recovering such damages by reason of the conveyances executed by them and their predecessors in interest, under which by far the greater, if not all, of said canals and laterals were constructed, and by their acquiescence and consent to the construction of all of said canals and laterals?

We have already referred to certain deeds executed either by the plaintiffs or their predecessors in interest, under which some of the canals complained of were constructed over the plaintiffs' lands. Besides these deeds conveying

rights of way for specific canals named therein, there was the deed from John W. Mitchell, who owned the Titus ranch a long time prior to the time the plaintiffs acquired their lands. In this instrument Mitchell, who was the party of the second part, granted to the Merced Canal and Irri-. gation Company, a predecessor in interest of the defendant, ''and assigns the right of way for the purpose of constructing and using ditches, canals, flumes, pipes and conveyances for water through and across all the lands hereinbefore mentioned and all lands belonging to party of the second part situate in said county of Merced south of the Merced river''. ■ It is conceded that the lands referred to in this conveyance included the lands now owned by the plaintiffs in the Titus ranch. Plaintiffs claim that this deed is void for uncertainty and for other reasons is invalid. We think none of these objections can be maintained, but we do not rest our decision in this case solely upon the effect of this conveyance. Aside from this deed plaintiffs concede that they acquiesced and consented to the construction of all of said canals and laterals, both those which were constructed under express grants of rights of way therefor, and those which were not so constructed.

■ Nevertheless, the plaintiffs contend that they are entitled to damages under the Constitution of the state, which provides that private property shall not be taken or damaged for public use without just compensation having been first made to the owner. (Const., art. I, sec. 14.) Plaintiffs contend that they occupy the same position regarding their right to recover damages claimed to have been sustained by reason of the seepage from defendant's canals, as if, instead of securing grants of rights of way, and rights by acquiescence and consent, the defendant had by condemnation proceedings acquired the right to construct said canals over the lands of plaintiffs. In *Sternes* v. *Sutter Butte Canal Co.*, 61 Cal. App. 737, 741 [216 Pac. 66], it was held, ''that a grant of a right of way, in general terms, is the exact counterpart of whatever damages would be considered and determined by the court and allowed in condemnation proceedings''. We think the same rule would apply when instead of a grant deed the land owner expressly agreed to the taking of his property for public use. In case private property has been taken by condemnation the rule

is that the owner has received in said proceeding all damages to his property which would be the natural, necessary and reasonable incident to the taking thereof for public use. In case he has given his consent to such taking by deed, he is precluded from subsequently recovering any damage that he might have recovered in an action had the public use been taken by condemnation. (*Sternes* v. *Sutter Butte Canal Co., supra.*) We think the same rule applies where the private owner has, as the plaintiffs in this case have, expressly consented to the taking of their property for a public use. Particularly should this be so when, as in the instant case, the private owners have not only acquiesced and consented but have importuned and demanded the construction of the public improvement upon their property.

Under these circumstances the plaintiffs, in respect to their right to recover damages for seepage of water upon their lands from defendant's canals, are in the same position as they would have been in had the defendant condemned the right to construct said canals upon plaintiffs' lands. If damages for seepage could be recovered in a condemnation proceeding, then the plaintiffs, having expressly given their consent to the construction of said canals upon their lands, are precluded from thereafter recovering any damages which they may have sustained from the seepage of water therefrom. In the case of *Sternes* v. *Sutter Butte Canal Co., supra,* this question was squarely before the court, with the result that the court held that damages for seepage was a proper item to be taken into consideration by the court in determining in a condemnation proceeding the extent and amount of defendants' damage. That part of the opinion in that case bearing upon this question is to be found on page 742 and is as follows: "That damages inflicted upon land not taken by seepage may be considered in condemnation proceedings seems clearly allowable. In *Denver City Irr. Co.* v. *Middaugh,* 12 Colo. 434 [13 Am. St. Rep. 234, 21 Pac. 565], the court thus expressed its views: 'In assessing damages in condemnation proceedings for lands taken for the purpose of constructing a ditch or reservoir thereon, injuries likely to result from seepage and leakage from such canal or reservoir would naturally be among the first items to occur to a jury'. Further: 'An examination of the reported cases shows that there is no substantial difference

in the general rules applicable to the assessment of damages in condemnation proceedings, as announced by the courts of last resort, but in the application of such rules to particular cases the same uniformity has not been observed; still no case has been called to our attention which by any fair construction can be held to be in conflict with the conclusion that damages for seepage and leakage should have been determined in the first proceeding.'

"In the more recent case of *Farmers' Reservoir & Irr. Co.* v. *Cooper,* 54 Colo. 402 [130 Pac. 1004], the supreme court of Colorado uses the following language: 'In condemnation proceedings all damages, present and prospective, that are the natural, necessary or reasonable incident of taking the property sought to be condemned, must be assessed.' It was there held that seepage, and damages resulting from seepage, constituted an incident to be considered by the court or jury whenever land was taken for a right of way to construct a canal."

We find nothing contrary to this decision. Plaintiffs have cited the case of *Turpen* v. *Turlock Irr. Dist.,* 141 Cal. 1 [74 Pac. 295], where the trial court expressly found that the canals were negligently constructed and this court held that "damages caused by the seepage from faulty construction of the canal could not have well been anticipated, and were not included in the condemnation proceeding." Such damage was not the natural, necessary and reasonable incident to the use and operation of said canal. In the present action the court found that the canals and laterals were constructed with care, skill and prudence and in a workmanlike manner. Plaintiffs do not question this finding. The seepage therefrom was only in such quantities as was usual and unavoidable from canals of that character constructed over lands like the plaintiffs'. It was therefore but the natural, necessary and reasonable incident to the use and operation of said canals. It was such damage as could be recovered in an action of condemnation. Quoting further from *Sternes* v. *Sutter Butte Canal Co.,* p. 743 of 61 Cal. App., the court said: "It thus appears by an unbroken line of authorities, and also as well by good reasoning, that whenever a grant of a right of way is executed by a land owner he thereby estops himself from afterward prosecuting any action for the past, present or future damages that

may have occurred, or reasonably be expected to occur, by reason of the necessary, natural, and ordinary use of the utility or public service for which the right of way is granted. And this includes the natural, reasonably to be anticipated, and ordinary injury resulting to adjacent land from seepage, if the land is of a character that admits of or may be reasonably expected to admit of such action of the waters taking place.''

We have no question that the facts in this case bring it within the rule announced above. Plaintiffs concede that their lands were sandy and porous in character. They, and their predecessors in interest, well knew that canals constructed over them would cause more or less seepage. They did not in their conveyance or rights of way, or in any other manner make any provision to protect themselves against such damages, or require of defendant that it construct any particular kind of canal or that the canals be constructed of any material different from the soil and materials through which they were built. Plaintiffs admit that they knew that said canals would seep large quantities of water unless they were lined with cement and that this knowledge was gained from reading a report prepared by J. D. Galloway, an engineer employed by the district to make investigations regarding the conditions in the district preparatory to the preparation and adoption by the district of plans for a comprehensive irrigation system. This report was prepared and presented to the district some time prior to June 23, 1921, as we find on that date Mr. Galloway presented a supplemental report to the board of directors of the district. We have been unable to determine the date of the original report. The supplemental report was filed almost a year before the two deeds of rights of way from the East Side Investment Company to the district were executed and about the same length of time before the date of the deed from the plaintiff Lyon & Hoag to the district. In none of these deeds is there to be found any provision for the lining of the canals or for the protection of the grantors from damage due to seepage. Considerable correspondence passed between the several plaintiffs and the district before and during the time the canals and laterals complained of were being constructed, and our attention has not been directed to a single line in this correspondence in

which the plaintiffs or any of them expressed the belief, or in the slightest respect indicated that they expected the canals would be lined or constructed any differently than they were actually constructed. From these facts we can draw but one conclusion and that is that the plaintiffs and their predecessors in interest at all times before and after they consented to the construction of the canals and laterals upon their lands knew that in all reasonable probability there would be seepage from said canals as a matter of course, and with this knowledge they executed said deeds to rights of way for said canals and in other ways already referred to acquiesced in, consented to, and demanded the construction of said canals and laterals across their lands. Under these circumstances it is apparent that the damage, if any, sustained by the plaintiffs by reason of seepage from said canals was "the natural, reasonably to be anticipated, and ordinary injury resulting to" their lands from the construction of said canals, and under the authorities above cited plaintiffs, by the grants of rights of way, and other acts indicating consent to the construction of said canals, are estopped from prosecuting any action for the recovery of such damage by reason of the said seepage from said canals.

Plaintiffs make the claim, however, that they and their predecessors in interest were led to believe by the defendant that they would be protected from any damage which might arise from seepage and that said grants of rights of way and their acquiescence and consent to the construction of said canals were obtained under the belief that the defendant would line said canals with cement, and would install appliances for the drainage of said lands, should the same require drainage. This claim is based almost, if not entirely, upon the report of Engineer Galloway already referred to. This report, as we have seen, was prepared by Mr. Galloway for the district before the district began the construction of its irrigation system and for the purpose of providing a comprehensive plan under which the district could work and install an adequate and proper system for the irrigation of the lands of the district. In his report, Mr. Galloway emphasized the drainage problem as one of the serious problems with which the district would have to contend after its irrigation system was in operation. He

mentioned, as the most feasible and practicable solution of the drainage problem, lining of canals to prevent seepage, excavation of open ditches, and installation of pumping plants lifting water from the lower strata. He estimated that it might be necessary to spend $750,000 for drainage purposes, and that this amount might be exceeded in the distant future. He expressly stated that the problem was one to be solved in the future. In a subsequent part of his report he placed the costs ''for pumps, canals, etc., the sum of $350,000''. It is not contended by plaintiffs that they had any promise or understanding, either direct or indirect, that the district would install any system for the drainage of their lands. If they placed any reliance or confidence in the report of Mr. Galloway they had every reason to believe that there might be a certain amount of seepage from the canals, yet neither the plaintiffs nor their predecessors in interest made any attempt to have the district protect them from such damage. The grants of rights of way, as we have seen, were absolute in form and contained no reservations or provisions which might be construed into an attempt to provide against damage from seepage, or as a requirement of the defendant to line its canals or to install any drainage facilities. When the plaintiffs were urging and insisting that the district hasten the construction of said canals so that they might secure water upon their lands, they gave no intimation that they were relying upon the Galloway report or upon any implied promise of the district that they would be given special protection from the results which they had every reason to expect would follow from the construction of earthen canals in which to convey the water to and over their lands. There is no evidence before us of a convincing character that either the plaintiffs or their predecessors in interest were influenced in any manner whatever by anything contained in the Galloway report.

The court found that the defendant had not damaged the plaintiffs in the ''particulars set forth in plaintiffs' complaint or any of said particulars, or in any other manner or in any amount at all''. There is no question that the water plane under plaintiffs' lands is higher now, or was at the time of the trial than it was in years previous and before the canals of the defendant had been constructed upon their lands. There was also ample evidence to support a finding

that this rise in the underground water was largely due to seepage from defendant's said canals. On the other hand, there was evidence that long prior to the organization of the defendant district and as early as 1904, the water plane under the lands of plaintiffs began to rise due in part at least to the extensive irrigation system constructed and operated by the Crocker-Huffman Co. upon their land to the north and east of the Titus ranch. G. S. Bloss, who owned the Titus ranch from 1904 to 1919, testified that there was a gradual rise in the water plane during the time he owned the ranch of about one foot a year. Other witnesses gave testimony corroborating this evidence. While there was evidence that after defendant constructed its canals upon the Titus ranch, the rise in the water levels showed even a greater increase than in previous years, yet plaintiffs' own witness, H. L. Haehl, an engineer employed by the plaintiffs to make measurements and observations in regard to the water plane under the Titus ranch, testified in a number of instances that the measurements made by him showed a rise in this water plane of about one foot per year from 1920 to 1927. It will thus be seen that there is substantial evidence to be found in the record showing that the rise in the water plane in the Titus ranch showed no increase after the construction of defendant's canals over what it had been before the defendant began any of its irrigation projects.

Conceding that the evidence shows that there was some increase in this rise of water after the date defendant began its operations, there is ample evidence in the record to account for a material part, if not all, of said increase. In January, 1922, the defendant district acquired the irrigation system of the Crocker-Huffman Company. At that time there were only 52,000 acres of land under irrigation. The district immediately began to extend the irrigation system acquired by it not only to lands lying northeast and east of the Titus ranch, but into the Titus ranch itself. In 1924, there were 66,000 acres irrigated in the district; in 1925, 93,000; in 1926, 103,000, and in 1927, 112,000 acres. As we have seen, the plaintiffs' lands were located in practically the lowest part of the district and necessarily they would receive an increased amount of underground water as irrigation was extended to the lands in other parts of the district. So whatever increase there was in the elevation of the water

underlying the lands of the Titus ranch, could be reasonably accounted for to a large extent by the increase in the acreage within the district brought under irrigation during this period of time. The court further found, and there was substantial evidence to support the finding, that the users of water on the Titus ranch carelessly and negligently caused large portions of water delivered to them for irrigation purposes to run into certain swales and depressions and accumulate therein, thus causing the ground water thereunder to rise during the spring and summer. The court also found that an artesian well installed on the Titus ranch and flowing a large stream of water had been permitted to flow during the period complained of and that the water from this well had contributed to a certain extent in causing the rise of water under portions of the Titus ranch. With this testimony before us we are unable to hold that the finding of the court that defendant had not damaged the plaintiffs, finds no support in the evidence. On the other hand, it is apparent from the references herein made to the testimony that said finding finds substantial support in the evidence.

There are other specifications as to the insufficiency of the evidence but they relate to minor matters and we deem it unnecessary to give them any special consideration for the reason that if we are correct in the views expressed above, these other questions are of no material importance. For the same reason we consider it unnecessary to pass upon the question as to whether the plaintiffs' cause of action is barred by the statute of limitations or to discuss other findings of the court made in response to said affirmative answer. If plaintiffs have failed to sustain the cause of action alleged in the complaint, as we have held they have, then it is of no consequence, in so far as this action is concerned, whether the alleged cause of action is or is not barred by the statute of limitations, or whether or not certain of the affirmative defenses were sustained by the evidence.

Plaintiffs' second cause of action, in which they ask for a mandatory injunction requiring the defendant to install suitable drainage works to drain their lands and to remove therefrom the water brought to said lands by the defendant is predicated upon an act of the legislature entitled, "An Act to provide for drainage by irrigation districts". (Stats. 1907, p. 569.) Section 1 of this act empowers an irrigation

district to "provide for any and all drainage made necessary for irrigation provided for" by the laws relating to irrigation districts. Section 2 of said act reads as follows: "Whenever it appears necessary, or proper, or beneficial to the lands affected thereby, to drain such lands or any portion thereof on account of the irrigation which has been done, or which is intended to be done under such laws, whether for the purpose of more beneficially carrying on such irrigation, or to protect such districts from liability by reason of such irrigation, whether the irrigation works have already been constructed or not, it shall be the duty of the board of directors to provide for such drainage, and said board and its officers, agents and employees shall do all necessary and proper acts for the construction, repair, maintenance and management of drainage work for such purpose."

It is the contention of the plaintiffs that the duty of an irrigation district to furnish drainage to lands within the district requiring the same is expressly enjoined upon it by this statute, and therefore such duty may be enforced by mandate of the court. (Code Civ. Proc., sec. 1085.)

There can be no question but that by this act of the legislature, an irrigation district is given the power and authority to provide for drainage made necessary by the operation of the irrigation system installed and operated by the district. It is equally clear that this act makes it the duty of an irrigation district to provide for such drainage. Being a duty enjoined by law, it can be enforced by a mandate of court. Whether in a particular case a land owner in the district can invoke the aid of the court to compel the district to perform the duty imposed upon it by the statute would depend upon the facts of that particular case. There are two propositions at least which must be established before a court would be justified in issuing the mandate requiring the district to perform the duty of providing drainage. The first of these is that the land owner in the district must prove by satisfactory and sufficient evidence that his lands are in need of drainage made necessary by the irrigation operations of the district, and the second is whether the district is acting under the power conferred upon it by the statute and is doing all within its power to perform the duty enjoined upon it by the statute.

As to the first of these two propositions, we think there can be no question but that the plaintiffs have shown that their lands are in need of drainage by reason of the irrigation operations of the district. On a large part of the plaintiffs' lands the evidence shows that the underground water is so near the surface that neither trees, vines, nor ordinary crops can be profitably grown thereon. This high water plane is shown to be due in the main to the irrigation of plaintiffs' lands and those of the district lying in their near vicinity and to the east and northeast of the Titus ranch. It is also shown that a certain amount of water seeps from defendant's canals and ditches and contributes to the rise of the water underlying plaintiffs' lands. Practically the only contributing cause to the rise of this water plane, not due to the acts of the district is that which is occasioned by the artesian well heretofore mentioned. The defendant had no control over said well, but its influence upon the water plane was confined to only a small area adjacent to said well and in itself constituted but a small factor in producing the general condition existing through plaintiffs' lands.

We will now pass to the second of the two propositions stated above, and in its consideration we will endeavor to determine what steps, if any, the defendant has taken toward discharging the duty enjoined upon it by the statute to drain plaintiffs' lands, and whether the same have been such as to constitute a reasonable compliance with the requirements of the statute. We have already referred to the report of Engineer Galloway, made before the district had begun any of its irrigation operations. In that report the question of drainage was given extended consideration and the best means of draining lands of the character of those composing the district were outlined in said report with great care. Following the installation by the district of its irrigation system, as shown by the findings quoted above, large sums of money were expended by the district in the lining of its canals, so as to prevent seepage therefrom upon adjacent lands, and in sinking wells and installing pumps thereon for the purpose of extracting water that had as a result of the irrigation in the district flowed into and collected under the lands in certain parts of the district. No question is raised but that the means thus employed were

suitable and proper for drainage purposes. The evidence further shows and the court finds that the district had at the time of the trial made provision in its annual budget for a large sum of money, amounting to $288,048.24, "for drainage purposes and lining of canals". It will be presumed that the same policy of raising money for the purpose of perfecting and extending its system of drainage has been followed by the district in succeeding years. At least there is nothing before us that the district has not done so.

But disregarding what the district may have since done, the evidence shows that up to the time of the trial it had followed a consistent, effective and comprehensive plan for the drainage of the lands in the district, including those of the plaintiffs, and with particular reference to the efforts of the district to drain the lands of the plaintiffs of the underground water therein, the court found: "That the defendant has done all that it could reasonably and fairly and equitably do for the drainage of plaintiffs' lands, and the control of the ground water flowing therein and thereto, with the funds available for that purpose and that the money heretofore expended by defendant for the control of the ground water and the canal lining as set forth was all the money that could have been fairly and equitably expended for that purpose."

It is true that the district has not yet solved its drainage problems, nor has it installed sufficient and adequate equipment to thoroughly drain all of plaintiffs' lands. In fact, the evidence shows that at the time of the trial, large bodies of plaintiffs' lands were injuriously affected by surface waters that had accumulated in and under said lands as a result of the irrigation of lands in the district. Plaintiffs insist that under the statute they are entitled to have their lands, if not absolutely, at least reasonably drained and freed from the water that has thus accumulated thereunder. Under a proper showing they would undoubtedly be entitled to this relief, but not under the facts proven in this proceeding. The plaintiffs are, of course, entitled no no greater right than any other land owner in the district whose lands are situated and affected similarly as those of the plaintiffs. There is evidence in the record, which we think is uncontradicted, that there are 50,000 acres of land in the district in need of drainage on the average more seriously than do

the lands of the plaintiffs. If the plaintiffs are entitled to a mandatory injunction requiring the district to drain their lands so that they will be free from ground water injuriously affecting them, then the balance of the owners of the 50,000 acres of land, whose lands are entitled to drainage by the district, would be entitled to the same remedy by the courts; and if the plaintiffs are successful in this proceeding, then it would only be reasonable to expect the balance of the owners of lands similarly situated to seek enforcement of their rights. The result would be that the district would be forced at once to enlarge its drainage system by the lining of practically all its canals and ditches, and by sinking wells equipped with pumps sufficient to drain all of the 50,000 acres in the district entitled to drainage. According to the testimony of Mr. Means, an engineer and a witness for the defendant, canal lining would cost about $12,000 a mile, or between six and eight million dollars to line the canals of defendant in the sand area alone, and lining of canals without drainage works would not, according to Mr. Means, control the ground water. The evidence shows that the district is in no position to meet the cost of such extensive additions to its present drainage system. The district had at the time of the trial a bonded indebtedness of $16,000,000, and the entire assessed value of all property within the district was less than $23,000,000. Its tax rate was one of the highest in the state. To compel the district to immediately install the facilities and works necessary to drain all the land in the district requiring drainage would bring financial ruin upon the district and irreparable injury to the land owners in the district, including the plaintiffs. We do not believe that, under this state of facts, it was ever intended by those responsible for the enactment of the Drainage Act of 1907, that an irrigation district, situated as is the defendant in this action, should be compelled to work its own destruction by undertaking to provide drainage facilities for the district, the expense of which is beyond its financial ability to meet or pay for. In fact, before a writ of mandate will issue to compel a public corporation or agency to perform an act involving the expenditure of money, it must affirmatively appear that there are funds

available for that purpose. (*Buschmann* v. *Turlock Irr. Dist.*, 47 Cal. App. 321 [190 Pac. 491]; *Nelson* v. *Anderson etc. Irr. Dist.*, 51 Cal. App. 92 [196 Pac. 292]; *Farris* v. *State*, 46 Neb. 857 [65 N. W. 890].)

In the Nelson case, the court said: "By finding 16 it appears that there is no money available, and cannot be made available, for the immediate construction of lateral 3–1–2, under the law authorizing an assessment of two per cent of the aggregate value of the lands within the district, as provided by chapter 291 of the statutes of the state of California enacted in 1919; and that the amount of money in said fund so created does not exceed the aggregate of the duly authorized and issued warrants of said Irrigation district. As to when any of the funds of the district can be used for construction purposes, and what steps must be taken to authorize such use, have been discussed by this court in *Buschmann* v. *Turlock Irr. Dist.*, 47 Cal. App. 321 [190 Pac. 491], and need not here be repeated. And until these funds are available for the construction of the canals, ditches, and laterals authorized by the voters of the district, it is evident that this court can issue no mandate requiring the immediate undertaking of such work. It will be presumed that the directors of the district will expend the money for the purposes for which it has been raised, and the fact that the directors of the district were not able to complete the construction of the lateral referred to out of the moneys raised as the proceeds of prior bond issues does not authorize the issuance of the writ of mandate. It must be first shown that the money is available before its application can be directed. We do not deem it necessary to cite authorities upon this point."

Our conclusion, therefore, as to the second proposition stated above, is that the defendant district recognizes the duty imposed upon it by the statute and is endeavoring to comply with the requirements of said statute. While it has not succeeded in discharging this duty to its fullest extent, it has done all that could reasonably be required of it with the money available for that purpose, and which the resources of the district will permit. Under such a state of facts, the writ of mandate will not lie. ▇ The writ is

an equitable remedy and will not always issue as a matter of right. As was said in *Gammon* v. *McKevitt*, 50 Cal. App. 656, 665 [195 Pac. 726], "The writ of *mandamus* is not wholly a writ of right, but lies to a considerable extent within the sound judicial discretion of the court where the application is made; and no court should allow a writ of mandate to compel a technical compliance with the letter of the law, where such compliance will violate the spirit of the law". In California Jurisprudence, volume 14, page 178, the rule is stated as follows: "As in other cases, the propriety of issuing a mandatory writ is determined according to the particular circumstances, and issuance of it rests in the sound discretion of the court." The author cites in support of this text, *Clough* v. *W. H. Healey Co.*, 53 Cal. App. 397 [200 Pac. 378].

The present action appears to have been thoroughly tried in the court below, the trial lasting about six weeks, and the reporter's transcript covering over 2,000 pages. Every phase of the drainage problems of the district was minutely gone into by each side through experienced engineers and able counsel. The trial judge visited the district and personally examined the lands therein and ascertained their condition in respect to drainage needs. He had the benefit of an inspection of the canals of the district, their susceptibility to seepage and the facilities installed by the district for the purpose of overcoming this seepage and of draining the underground waters underlying the lands of the district. The case was also thoroughly argued before the trial court. The brief of the plaintiffs, who are the appellants, is, as stated therein, simply an answer to the argument made by the district before the trial court. That nothing additional was contained in the defendant's brief in this court to that presented to the trial court, is indicated by the fact that the plaintiffs have filed no reply herein to the brief of the defendant. With these matters thus presented at the trial, that court refused to issue a mandatory injunction as prayed for by the plaintiffs. As we view the record before us, and as indicated in the views above expressed, we find no reason that would justify this court in holding that the trial court erred in its denial of said writ. We are, therefore, of

the opinion that its action in that respect should not be disturbed by this court.

The judgment appealed from is affirmed.

Shenk, J., Richards, J., Waste, C. J., Seawell, J., Preston, J., and Langdon, J., concurred.

Rehearing denied.