[Civ. No. 1847.   Fourth Appellate District.—July 27, 1937.]

MAUDE STEWART, Respondent, v. LULU SHEARMAN, Appellant.

Osborn and Burum for Appellant.

W. C. Dorris and R. W. Henderson for Respondent.

BARNARD, P. J.—The plaintiff brought this action to establish her right and quiet her title in and to one-half of a one-eighteenth interest in certain real property in Kern County, claimed to have been the community property of herself and her former husband Joseph A. Stewart, together with one-half of any proceeds received by the defendant who was the sister of Stewart. The findings and judgment were in favor of the plaintiff and the defendant has appealed.

The respondent married Joseph Stewart in 1913 and they lived together in Bakersfield until April, 1926, acquiring several pieces of community property. Some time in 1926 she went to Nevada and secured a divorce from him, the decree being entered on January 27, 1927. On November 10, 1926, they entered into a written agreement dividing between them certain named community property and each relinquishing any right or interest in or to any property which might thereafter be acquired by the other. No mention of the property in controversy was made in that agreement and the same did not purport to cover any property not listed therein. This property was not mentioned in the divorce proceeding al-

though the complaint alleged that there was no community property and the court so found. The decree made no reference to property rights. Stewart died in 1931, leaving a will in which this appellant was named as his sole legatee and devisee. In 1932 the whole of the estate was distributed to this appellant, this property not being mentioned, and the final decree included the usual omnibus clause distributing all property not known or discovered. On January 11, 1935, the respondent made written demand on the appellant for a conveyance of one-half of an undivided one-eighteenth interest in the property and that she account for all receipts therefrom. The demand was refused and this action followed.

The first and controlling question is whether or not Stewart had any interest in the real property in question. The matter arose out of the organization of a gun club. The appellant contends that several amounts paid by Stewart were in fact merely dues in this club, that he acquired no interest in the real property prior to the divorce, that he acquired merely a license or permission to hunt upon the land, that any possible right owned by him was personal property, that any claim of the respondent is barred by the terms of the decree of divorce and the property settlement, and further barred by her failure to appear and assert her rights in the probate proceedings. It is respondent's contention that she and her former husband possessed a community interest in this real property, that the same was not included in a property settlement agreement, and that upon the entry of the divorce decree they became tenants in common as to this interest in the property.

We think the evidence, with the reasonable inferences therefrom, is sufficient to support the court's findings to the effect that Stewart, during the marriage and while the parties were living together, purchased an undivided one-eighteenth interest in this property; that he paid a part of the purchase price out of wages earned by him during such time; that the interest acquired by him was not a mere license to hunt upon the land; and that the interest acquired was a right to purchase, supported by a valuable consideration, which was recognized by the holders of the legal title who thereafter conveyed in conformity to their contract and obligation and to complete and carry out the agreement. A brief review of the evidence follows:

In 1924 one Brantley acquired title to the tract of land, a portion of which is here involved. He organized a gun club intending to have eighteen members, but only ten or twelve "went in". Each of these, as Brantley testified, "paid a down payment of $54.00 and they gave me two notes each of $73.00", the notes being payable in one and two years respectively. Stewart paid $54 toward the end of 1924 or early in 1925 and gave Brantley two notes for $73 each, one payable February 6, 1926, and the other February 6, 1927. He paid the first note when it was due and the second on February 12, 1927. Brantley wrote on the back of the second note "Feb. 12th, 1927 Paid in full. This pays in full for one eighteenth interest in the following described property (here follows description)". He signed this memorandum and redelivered the note to Stewart. In August, 1934, Brantley leased the property to an oil company. On January 4, 1935, Brantley and his wife conveyed a one-eighteenth interest in the property to the appellant as "sole devisee and legatee under the will of Joseph A. Stewart, deceased", the deed reciting "This deed is executed to carry out an unrecorded agreement made by the Grantors with the said Joseph A. Stewart in his lifetime" and that the conveyance was made to the grantee under authority of the decree of distribution entered in Stewart's estate. On January 28, 1935, the first returns from oil under the lease which Brantley had made was received by the appellant and monthly returns continued up to the date of the trial.

The respondent and another witness testified that just before the property settlement agreement was executed and delivered Stewart told the respondent that there was an assessment due on the gun club property and that he intended to let the property go. The appellant testified that shortly before the second note came due Stewart said to her "I think I will give up that membership because I haven't the money to pay it", that she replied "I wouldn't quit anything that I thought would give me pleasure, I think you deserve it and I will give you the money", and that she gave him the full amount of the note.

Brantley testified that he did not acquire the property prior to the organization of the gun club but that he "acquired it for the purpose of the organization"; that he thought he had eighteen members "lined up" but only about ten went in; that Stewart paid him $54 and gave him the two

notes which he later paid; that there was no written agreement prior to his delivery of the deed to the appellant except "what is on the back of that note", that there was no conversation between him and Stewart at the time the note was paid, or before that, about conveying the property to Stewart or about his interest in it; that he never executed any contract except the memorandum on the note and the deed later delivered to the appellant; that his wife did not sign any contract other than the deed; that thirteen people who originally started in the gun club made a "down payment" but only three, including Stewart, "paid in their money and consummated their transaction"; that toward the end of 1925 "we had a meeting one night up here and they passed a mosquito abatement around Bakersfield, where you couldn't have a gun club within a certain distance of Bakersfield and this was just outside so they decided they wouldn't go through with it, cost quite a lot of money to put up power line, there had to be power put in you know, so I told them if they didn't want to pay it they didn't have to, which the rest of them didn't except Stewart and two others, and I had the notes for 10 years and they never did pay them; however, Stewart paid his and Clyde George paid his; Sammy Olhmam paid his in a way, I had some notes of his and gave them back to him, and that is the three that paid the money"; that at that meeting the gun club was "practically abandoned"; that after talking about the additional expense and the danger of the mosquito district being extended he asked the men whether they wanted to bear that additional expense or drop the proposition; and that "they dropped it at the meeting". When asked when he told these parties that they could have an interest in the property itself Brantley replied: "Well, I didn't tell them after this—they struck oil out on that place, nobody considered it very seriously, these fellows paid their money and when they struck oil I gave them a deed for their part."

While the appellant lays great stress upon Brantley's testimony that nothing was said at any time about when title was to pass we think the evidence justifies the inference that at the meeting in 1925 the gun club part of the proposition was dropped by everyone, that most of those who had paid a down payment then dropped out completely, but that three of the parties, including Stewart, elected to go ahead and pay their notes. These further payments were for something and it

is quite apparent that they were not for dues and assessments in the gun club which had been abandoned. There is no evidence that Stewart or anyone else hunted on the property, or that the payments made by the three who continued to display an interest had anything to do with hunting privileges. The entire evidence supports the conclusion that under the original plan the down payments and the payments represented by notes were intended to pay for an interest in the property, and that in paying his notes Stewart acquired such an interest. While the agreement was informal in many respects the evidence supports the findings to the effect that Stewart acquired and exercised a right to purchase an interest in the property which was recognized by the vendors and confirmed by a subsequent conveyance. It follows that Stewart was the owner of an interest in this real property during the marriage, irrespective of the fact that the first written acknowledgment of his right was signed a few days after the decree of divorce was entered.

The interest thus acquired by Stewart being community property and not having been disposed of by the property settlement agreement was not affected by the decree of divorce entered in Nevada, and became the property of the respondent and Stewart as tenants in common in equal shares. (*Taylor* v. *Taylor*, 192 Cal. 71 [218 Pac. 756, 51 A. L. R. 1074].) The only part of the purchase price which remained to be paid was $73 and some interest. Stewart could not by making this payment deprive the respondent of her right, as a tenant in common, to share in the result of completing the purchase, unless she refused to contribute her share of the cost. She had been led to believe that the property was to be abandoned and so far as the record shows she had no knowledge of the real situation until shortly before this suit was filed. The purchase having been completed without her knowledge the conveyance received inured to her benefit under the usual rules, which are thus set forth in 7 Ruling Case Law, page 857:

"Cotenants stand in such confidential relation to one another in respect to the common property and the common title to it, that it would generally be inequitable to permit one, without the consent of the others, to buy in an outstanding adversary claim or title and assert it for his exclusive benefit, thereby to undermine the common title and injure and prejudice the interests of his cotenants. In such case

the purchasing tenant is regarded as holding the claim so purchased in trust for the benefit of all his cotenants, in proportion to their respective interests in the common property, who seasonably contribute their share of his necessary expenditures. This rule is said to be inflexible, without regard to the consideration paid, or the honesty of intent, for the reason that public policy requires it, not only as a shield to the parties represented but as a guard against temptation on the part of representatives. The utmost that can be demanded by one who purchases an outstanding title or lien is contribution from the others toward the expense of any purchase which releases the common interest from embarrassment.''

The usual rule that a tenant in common cannot take advantage of any defect in the common title by purchasing an outstanding title or encumbrance and asserting it against his cotenant would especially apply here where all that remained to do was to pay a small balance on the purchase price. By completing the purchase Stewart obtained the right to a title subject to a trust in favor of his cotenant. (*Burrow* v. *Carley,* 210 Cal. 95 [290 Pac. 577].) The court, in its judgment, deducted one-half of the amount paid on the second note and one-half of the expense incurred by appellant in obtaining a conveyance from the amount found due to respondent out of royalties received by the appellant.

█ Some suggestion is made that the respondent is estopped by the decree of distribution entered in the estate of Joseph A. Stewart from asserting any claim to a share in this property. The property was not mentioned in the probate proceedings which, in any event, would affect only Stewart's interest therein. The interest of respondent as a cotenant with Stewart was not involved in the probate proceedings and was in no way affected thereby.

The judgment is affirmed.

Marks, J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 21, 1937.