[Civ. No. 15151.   First Dist., Div. Two.   Feb. 17, 1953.]

GILBERT RICHARDS et al., Appellants, v. R. E. PLUMBE et al., Respondents.

James Martin MacInnis and William F. Cleary for Appellants.

William M. Maxfield and Ralph Coffey for Respondents.

JONES, J. pro tem.—This appeal is taken from a judgment decreeing that appellants have no interest in an oil and gas lease on lands in Sacramento County; nor in the rentals which they yield. In addition to a declaration of their rights in the lease and the royalties appellants have also sued for an accounting for past collections and to restrain the payment of any monies collected under the lease to the respondent Plumbe. The action is founded upon an agreement of mutual undertaking made by appellants with Plumbe. The trial court found that this agreement had been annulled and abandoned by mutual consent before the lease came into existence.

Appellants challenge the sufficiency of the evidence to sustain this finding and in addition make the contentions that the evidence is not sufficient to sustain other findings, that certain documentary evidence relating to the boundaries of the Rio Vista Gas Field was improperly admitted, and that a motion to strike a portion of the testimony of Plumbe should have been granted. If there is evidence not involved in the three latter contentions sufficient to support the finding that the agreement was annulled and abandoned, these contentions become immaterial and present no problem of prejudicial error.

It is an elementary principle of law that when an appeal is taken every intendment is to be indulged in which tends to support the judgment, and every reasonable inference

that may be drawn from the facts which tend to support a finding must be accepted. (*Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689].) The construction of the evidence is to be in support of the finding (*Patten & Davies Lbr. Co.* v. *McConville*, 219 Cal. 161, 164 [25 P.2d 429]), with all conflicts resolved in favor of the respondent. It may also be said that when the charge is made that the evidence is not sufficient to sustain the determination of the trial court, "such contention requires" the appellant "to demonstrate that there is no substantial evidence to support the challenged findings" (*Nichols* v. *Mitchell*, 32 Cal.2d 598, 600 [197 P.2d 550]). Furthermore the burden is on the appellant to show such a lack of substantial facts in the record that the reviewing court may say as a matter of law that there is no ground upon which the trial court could have based any reasonable inference in support of its finding, and unless this burden is met, a reversal should not be ordered. Nor is the reviewing court permitted to substitute an inference different from that drawn by the trial court. In *Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183], it is stated that "It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court."

Passing to the contract upon which appellants rely, it is found to be couched in this language:

## "AGREEMENT

"WHEREAS, R. E. Plumbe, of Alameda, California; Gilbert Richards of San Francisco, California; and John R. Daley, of San Francisco, California, have associated themselves together as one in the business undertaking of seeking, locating or otherwise acquiring, leasing, operating, buying, selling, or otherwise dealing in oil and gas leases or properties, oil and gas, cracking processes and all other things relative to petroleum and its derivatives, for the purpose of profitable gain and a division of all such cognate benefits on a share and share alike basis of the net gain thereof.

"Now THEREFORE, the three above named parties whose signatures of assent and agreement to the foregoing preamble

hereto appear below, for and in consideration of one dollar each to the other paid in hand and receipt of which is hereby acknowledged, agree and do hereby agree to execute and perform each to the full extent of their ability and effort in furthering the progress of the above mentioned business, pertaining to the Rio Vista Oil and Gas Field of California. DONE this 15th day of March, A. D. 1947.

| Lu Netta Joy Plumbe | R. E. Plumbe |
|---|---|
| Witness | R. E. Plumbe |
| | Gilbert Richards |
| Witness | Gilbert Richards |
| | John R. Daley |
| Witness | John R. Daley '' |

The trial court's finding with respect to the abandonment of this agreement is as follows:

"It is untrue, however, that said agreement (Plaintiff's Exhibit '1' in evidence) constituted evidence of or the terms of an agreement between the parties signatory thereon which was in effect during the times hereinafter referred to and concerned in this action, and it is true that any agreement between the parties as evidenced by said document was, prior to the times hereinafter referred to and concerned in this action, cancelled and annulled by the mutual consent of the parties thereto and by the abandonment by the parties thereto of the enterprise as therein contemplated, to the effect that the same did not exist as an agreement or evidence of an agreement between the parties effective or concerning the times hereinafter referred to and herein involved.''

The record discloses that pursuant to their agreement, appellants and Plumbe secured a lease on $2\frac{1}{2}$ acres of land owned by one Slawek definitely located within the boundaries of the Rio Vista Gas Field, together with leases on other properties the location of which was uncertain with respect to the then recognized boundaries of the field. Through failure to secure a license from the state to drill a well on the leased lands, and for other reasons, all of the leases expired and in the latter part of May, 1947, appellant Richards went about other business and appellant Daley removed to Wyoming.

Plumbe, however, continued his activity in the Rio Vista area, and was approached by a Mr. Gardiner who suggested that he undertake to develop the Gardiner acreage situate near the Georgiana slough as a wildcat proposition. The Gardiner lands were well without the recognized boundaries

of the Rio Vista Field. Plumbe interested the respondents Smith, Lucas, Riddle and Slater in the offer of Gardiner. Individual leases on other lands in the immediate vicinity were secured by them. They then undertook to develop a well on the Gardiner property.

The unchallenged testimony of the defendant Smith, in regard to this association and the activities of his associates, was given as follows: ''Q. You had known Mr. Lucas before? A. Many years. Q. He was in the welding business and had used your products, I suppose? A. Yes. I had been together with him on other oil deals before, back to 1928. Q. Do you recall when you went to Los Angeles to see Mr. Lucas? A. In the latter part of June, 1947. Q. And what was the outcome of that conference? A. Well, he criticized the individual leases, and suggested that we go back and get him a community lease, and add to it as much acreage as we could. Q. Was that with the idea of drilling the Slawek land, or with the idea of putting on a wildcat in an entirely new field? A. It was the idea of putting down a wildcat well in an entirely new field. Q. And most of the acreage, other than the Slawek piece, at that time was not considered part of the Rio Vista Field, was it? A. No, it was not. Q. And for that reason, it could not be used as total acreage for pro rate within the Rio Vista Field, is that correct? A. Well, the Gardiner property and the Lewallen property had been under lease to the Standard Oil Company of California, and they had given it up because their geologist had condemned the land as being unproductive of gas. Q. There were no wells on it at that time? A. There were no wells on it. Q. So, after your conversation with Mr. Lucas, you went into the area to obtain a community lease? A. That is correct. Q. As large an acreage as possible? A. That's right. Q. Who assisted in that endeavor, or who were the parties with you in that activity? A. Mr. Plumbe and myself did most of the work. Q. Were there any others? A. Well, Mr. Slater was along on some leg work. He did not obtain any of the signatures. Riddle also came along at various times. Q. When did you start on that work? A. As soon as we got back from—oh, I guess we started about the first or second week of July, 1947. The lease shows it was July 10th, I believe. Q. Would you say that you had started on that work in March or April or May? A. *Oh, no, I knew nothing about it. You see, I did not know Plumbe until June.* Q. Was any work done by anyone on this community lease prior to July of 1947? A. No. Q. Now, after the lease of July,

1947, was obtained, then what happened? A. Well, then they started pressing Lucas. Q. In other words, they wanted to get someone in there to drill? A. To get in there and drill, but he did not have the correct facilities to go in there and drill it. Q. Were there any shortages in the business at that time which controlled your activities? A. Yes, in well casing and tubular casing. Q. So ability to obtain well casing and tubing was essential in order to put down a wildcat well? A. That is correct. Q. And, by a wildcat, you mean by some independent person, other than the bigger companies? A. *No, a wildcat is any well that is drilled in an unproven area.* Q. But you knew that the big companies would not be interested, because Standard had turned it down, is that correct? A. Their geologist had turned it down. Associated and Shell also turned it down. Q. So you went back to Mr. Lucas to try to put over a deal with him? A. That is right. Q. And you had six months within which to do it, from and after July 10, 1947? A. That is correct. Q. Were you successful in doing it within that period of time? A. No, we were not. Q. For what reason, if you know? A. Well, they could not get pipe, and Lucas apparently was stalling. Q. In order words, the leases expired then, did they? A. *They expired on January 9, 1948.* Q. For the reason that you could not get anyone, up to that time, interested in drilling? A. That's right. Q. What next caused you to be active in connection with this transaction? A. Well, the next we learned was that Lucas had gone to Gardiner direct, and asked him for a lease to be made in his name and that of his wife which, if it had come about, why, Plumbe and Slater and Riddle and myself would have been out. Q. In other words, you got wind of the fact that after the *leases had expired* Lucas had bypassed you and gone direct to one of the larger landowners? A. That is correct. There is a telegram to that effect on file here. Q. And it was knowledge of the contents of the telegram of February 2nd, which was Plaintiffs' Exhibit B for Identification, and now is Plaintiffs' 17 in evidence, that you refer to? A. Yes. Q. As I understand it, the lease had expired on January 9? A. That's right." (Emphasis added.)

After the expiration date of the first community lease, Plumbe and Smith, together with their associates, secured a second community lease on the Gardiner and other properties. This is the lease in which the appellants now claim an interest by virtue of their agreement of March 15, 1947, with Plumbe.

Smith testified with respect to this second community lease: "Q. Now, after you made your peace with Lucas, you went to work on the second community lease, is that correct? A. That is correct. Q. Did Lucas ever at any time explain to you why he was not successful—Do you know why he could not succeed under the first lease, but yet was able to succeed under the second lease? A. The reason he was able to succeed under the second lease was that prior to coming to Isleton in February of 1948 he had had an understanding with the defendant Feldman, that Feldman had the pipe and the tools, and that Feldman would put up the money to drill under the terms of the Georgiana lease, which called for one well every 150 acres. Q. Did Feldman, to your knowledge, put up the money for it? A. Yes, he did. Q. Or was it assigned to someone else? A. No, Feldman employed the Brown Drilling Company to drill on the Gardiner property when they had spudded in, in March of 1948. Q. Do you know whether or not the lease was assigned to him prior to that time? A. The lease was assigned to Feldman on March 2, 1948, by Lucas. Q. What has been the history of the lease since then? A. Well, the landowners, the overriding royalty interests and Lucas' interests, amounted to 20 per cent, and Feldman then acquired, through this assignment of March 2, 1948, approximately an 80 per cent interest. Feldman operated the lease until Gardiner No. 1, 2 and 3, were drilled and put on production. He then sold a 50 per cent of his interest to Brazos Oil and Gas, a subsidiary of Dow Chemical Company, and subsequently has sold his remaining interest to a group called the Vista Rio Corporation."

Nowhere in the record does it appear that either appellant made the slightest contribution toward securing either the first or second community lease. The facts as disclosed by Smith's testimony show no relation whatever between the original undertaking of appellants and Plumbe, and the activities of Plumbe and his associates in securing and exploiting the first and second community leases. The conduct of appellants, and of Plumbe, is wholly inconsistent with the existence of either a partnership or joint venture.

As is said in *Beck* v. *Cagle*, 46 Cal.App.2d 152, 162 [115 P.2d 613], "The abandonment or dissolution of a partnership or joint adventure may take place by conduct inconsistent with its continuance." (See, also, *Middleton* v. *Newport*, 6 Cal.2d 57, 62 [56 P.2d 508]; and *Fooshe* v. *Sunshine*, 96 Cal.App.2d 336, 343 [215 P.2d 66, 16 A.L.R.2d 1143].)

█ Such was the determination of the trial court here, and this finding is, in our opinion, abundantly supported by substantial evidence.

The judgment is affirmed.

Nourse, P. J., and Goodell, J., concurred.

A petition for a rehearing was denied March 19, 1953, and appellants' petition for a hearing by the Supreme Court was denied April 15, 1953.