[Civ. No. 15023. First Dist., Div. Two. Apr. 30, 1953.]

INDUSTRIAL INDEMNITY COMPANY (a Corporation) et al., Respondents, v. GOLDEN STATE COMPANY, LTD. (a Corporation), et al., Appellants; THE ROBERT L. JOHNSON CORPORATION (a Corporation), Intervener and Appellant.

Robert W. Kenny, Victor E. Cappa, Maurice J. Hyman, Jerome Politzer, Hyman & Hyman and Kenny & Morris for Appellants.

Thelen, Marrin, Johnson & Bridges for Respondents.

Earl C. Berger and Park Chamberlain for Intervener and Appellant.

NOURSE, P. J.—This appeal relates to an action for declaratory relief regarding the rights of subscribers of Industrial Indemnity Exchange, a reciprocal insurance exchange, having as its field workmen's compensation insurance, hereinafter called "Exchange," under an agreement by which the business of said Exchange was transferred as a whole to Industrial Indemnity Company, an insurance corporation, hereinafter called "Company," for a price to be distributed to subscribers, and to cross-actions in behalf of said subscribers claiming mainly that all of the insurance business transacted by Company belonged in equity to Exchange, from whose business it was alleged to have been disloyally diverted by Industrial Underwriters, a partnership, the attorney-in-fact of said Exchange, hereinafter called the "Attorney" whose partners substantially owned the stock of Company.

A reciprocal insurance exchange, regulated in sections 1280-1530 of the Insurance Code, is an unincorporated business organization of a special character in which the participants, called subscribers (or underwriters) are both insurers and insureds; for their mutual protection, they exchange insurance contracts through the medium of an attorney-in-fact, empowered in each underwriters agreement not only to exchange insurance contracts for the subscribers, but also to exercise

all other functions of an insurer, e. g., to set rates, to settle losses, to compromise claims, to cancel contracts. The subscribers furnish by their premium deposits, the means required for losses and costs, reserves and surpluses of the reciprocal insurance of them all, and therefore are entitled to the equity in the assets of the Exchange subject to the purpose for which they have furnished said means. If the amount of premiums deposited is not fully required for the purposes mentioned, the excess, called savings, is returned in whole or in part as dividends. The attorney-in-fact receives a sizable percentage of the premiums deposited in consideration of which he does not only provide his own services, but also has to defray many of the costs of the business. In this case the Attorney, from the 17½ per cent of the premium deposits to which it was contractually entitled, had to provide and to pay for all offices, equipment and personnel required for the business of Exchange. The affairs of a reciprocal insurance exchange are normally supervised to some extent, and they were in this case, by an advisory commission which represents the subscribers and whose powers and formation are regulated in the underwriters agreements.

The matters now before this court found their origin in objections made in 1947-1948 by the Insurance Commissioner of the State of California to certain interrelations allegedly existing and certain transactions allegedly having taken place between Exchange, Attorney and Company. After some time the objections were embodied in two unsigned and undated drafts entitled ''Accusations,'' which culminated in the conclusion that the stated acts constituted ground for suspension or revocation of the certificates of authority of the Exchange or of Exchange and Company but which were expressly stated to be meant only as a basis of discussion. The main points raised related to the following alleged facts: The stock interest of the members of the Attorney in Company, a Corporation competing with Exchange in the field of workmen's compensation insurance and the existence of interlocking functions between them; the farming out since 1946 by the Attorney to Company of the performance of substantially all of the duties for which Exchange paid the Attorney, whereas the Attorney retained 20 per cent of the compensation received from Exchange; the segregation under the underwriters agreements in a special surplus fund of all investment income of the Exchange to serve in case of liquidation of Exchange as compensation for the activities and costs of

the Attorney in that respect; the reinsurance by Exchange since 1945 of the larger participating insurance policies written by Company and the treatment of said reinsurance business as normal reciprocal business of Exchange; the reinsurance by Company from 1939 until 1941 of possible assessment liability of the subscribers of Exchange at a premium considered excessive by the Commissioner. Long negotiations followed. The Commissioner originally took the position that there should be a complete separation of the interrelation objected to. The Attorney and the Company thought this unacceptable and maintained that all they had done was proper under existing law, agreements and circumstances (their said position was later generally sustained in the findings herein). However, in principle an agreement with the Commissioner was reached on the basis of the following plan: Company would as of January 1, 1949, take over all assets, assume all liabilities, take over and reinsure all policies of Exchange, and pay in the course of time to subscribers of Exchange an amount in cash which would as closely as possible equal the entire net worth of Exchange. To eliminate the necessity of basing on estimates elements of the net worth, such as liability for claims, unbilled earned premiums, and accrued dividends on policies, the Company would run out the business of Exchange as it existed at the end of 1948 for a maximum of three years and adjust the estimated amounts of such items in accordance with the actual results. The cash amount so obtained would, subject to change in the manner of distribution if a final court decision required a different manner, be distributed to those who were subscribers of Exchange on December 31, 1948, in proportion to the total earned premium of such subscribers with Exchange during the period 1931-1948, each subscriber receiving a minimum of $50. The Company and the Attorney made the following concessions with respect to some matters stated above as objected to by the Commissioner: The Attorney waived its right to the special surplus fund as compensation for liquidation activities, Company, with certain stated exceptions, to bear the costs of running out the business of Exchange; Company and Exchange agreed to terminate and reverse the reinsurance by Exchange of participating policies of Company from the beginning so that Company would not participate in the distribution to subscribers under the plan; to correct the amount of premium paid for the 1939-1941 reinsurance of assessment liability of subscribers of Exchange, said insur-

ance was made retroactively participating to the extent of 99½ per cent of the premium paid, which percentage would be refunded.

The Commissioner and the Attorney were both of the opinion that an agreement in accordance with the plan needed the consent of the subscribers of Exchange. After a summary of the plan with a letter of the Advisory Commission advising its adoption had been handed to all subscribers, approximately 98 per cent of them both according to number and premium volume signed written consents. On December 21, 1948, a written transfer and assumption agreement was executed to effectuate the plan stated above; the Commissioner approved it and on January 1, 1949, Company took over in accordance with said agreement.

Following a suggestion of the commissioner those in favor of the agreement, the Exchange, the Attorney, the Advisory Committee, three consenting subscribers in representative capacity and Company, brought this action for declaratory relief against all nonconsenting subscribers by name, praying for a declaration to the effect that past subscribers to the Exchange (no longer subscribers on December 31, 1948) have no interest in the net worth of Exchange, that the plan for distribution contained in the agreement is fair and that nonconsenting subscribers have no further rights than those given to them in the agreement. It will not be necessary to detail the pleadings of the several nonconsenting subscribers. They resulted in bringing before the court the defenses that the Attorney and the Advisory Committee had no authority to conclude the transfer and assumption agreement, that the consents of the Commissioner and subscribers were invalid because obtained by misrepresentations, that the transfer and assumption agreement was invalid as a fraudulent attempt by the Attorney to eliminate Exchange as a competitor of Company, that the transfer and assumption agreement did not give subscribers all that they were entitled to because it gave them neither the value of the goodwill of Exchange nor of the business of Company which belonged to Exchange on the ground that the Attorney and the Company of which it owned the stock had built up the business of Company in competition with Exchange in violation of the duty of the Attorney, and finally that methods of dissolution and distribution contained in the agreement were unfair. There was also before the court a cross-complaint of some nonconsenting subscribers in representative capacity asking a declaration that the assets and

business. of Company as built up since May 3, 1939, belonged to the subscribers of Exchange and further a declaration of rights as to the different points in dispute.

Moreover Robert L. Johnson Corporation, a subscriber which had signed a consent but had served notice of rescission of said consent on the Attorney, had intervened and united as a defendant, assuming the defenses and cross-complaint set out above, urged the invalidity of the consent on the ground of insufficient information and, because of an alleged equivocal position of the Attorney, prayed moreover for an accounting as to all that rightfully belonged to Exchange, and the appointment of a conservator of the property in dispute and a rescission in full of intervener's consent. Cross-defendants urged against the cross-complaint of the nonconsenting subscribers certain affirmative defenses including the defenses of the statute of limitations and laches and as against intervener moreover the defense of ratification.

. The court found in nearly all respects for the plaintiffs and against the cross-complainants; it found however against the above affirmative defenses of the cross-defendants. The judgment declared in substance that past subscribers had no interest in the Exchange and were not entitled to participate in any distribution; that the transfer and assumption agreement was fair and equitable, validly executed and binding on all past and present subscribers of Exchange, and that they had no right to any net worth or assets of Exchange except as provided in said agreement, that said agreement distributed to the subscribers all they were entitled to in the most equitable, reasonable and practical manner and that subscribers had no interest in the business or assets of Company. Judgment on the cross-complaints was for cross-defendants.

There are two separate main appeals, one from all of the judgment by three nonconsenting subscribers and one from all of the judgment except the part overruling cross-defendants' affirmative defenses by intervener and moreover there is a cross-appeal by cross-defendants as to said overruling of said affirmative defenses only. Over and above the points mentioned as having been before the trial court it was urged on appeal among other matters that the transfer and assumption agreement was unenforceable as a contract made by a trustee in his own behalf with respect to trust property, that intervener was erroneously barred from amending its pleadings so as to represent also other consenting

subscribers who might desire to rescind their consent and that there were certain inconsistencies in the findings.

We have concluded that the original action for declaratory relief should have been denied because the agreement to which it relates is void as violating section 1101 of the Insurance Code, expressly made applicable to reciprocal exchanges by section 1282 of said code. Section 1101 reads insofar as applicable to this case: "An admitted insurer's officers, directors, trustees and any persons who have authority in the management of the insurer's funds, shall not, unless otherwise provided in this code: . . . (c) Directly or indirectly purchase, or be interested in the purchase of, any of the assets of the insurer." Section 1106, Insurance Code, reads in part: "Any person violating . . . Sections 1101, . . . is guilty of a misdemeanor."

This exact point was not raised by any of the parties, but was briefed specially at the request of this court. ■ Nevertheless no action could be maintained on this agreement if it actually violated the code. " '[A] contract made contrary to the terms of a law designed for the protection of the public and prescribing a penalty for the violation thereof is illegal and void, and no action may be brought to enforce such contract . . . whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case.' " *Loving & Evans* v. *Blick,* 33 Cal.2d 603, 607 [204 P.2d 23].) ■ See for the rule that the court should on its own motion refuse to entertain the action when such illegality appears as a matter of law from the whole case before the court: *Union Collection Co.* v. *Buckman,* 150 Cal. 159, 165 [88 P. 708, 119 Am.St.Rep. 164, 11 Ann.Cas. 609, 9 L.R.A.N.S. 568]; *Endicott* v. *Rosenthal,* 216 Cal. 721, 728 [16 P.2d 673]; *Fewel & Dawes, Inc.* v. *Pratt,* 17 Cal.2d 85, 92 [109 P.2d 650]. Considering these authorities it cannot be denied, and it is not denied by respondents, that if the agreement violates section 1101, Insurance Code, it is void and unenforceable.

Neither is it denied nor could it be denied that the members of the Attorney are persons who have authority in the management of the funds of the Exchange. The interrelation between the Attorney and the Company, which is at the basis of this whole case, leaves no doubt that said partners in the Attorney would be interested in, at least indirectly, any purchase made by the Company. In this respect it will suf-

fice to quote from finding 16 of the court the following passus which is not attacked:

"The stock ownership of Industrial Indemnity Company has at all times been substantially the same as the ownership of Industrial Underwriters, a partnership, the attorney-in-fact of the Exchange."

However respondents contend that the agreement was not a beneficial sale of assets to the Company as prohibited by section 1101 but a transfer for the purpose of liquidating only. We do not agree. The amended complaint in paragraphs XXVII and XXXIII refers to *sale* and *selling* of all assets. The "Transfer and Assumption Agreement" provides among other things:

"Effective 12:01 A. M. January 1, 1949, Exchange will *sell,* assign and transfer and it does hereby *sell,* assign and transfer to Company all of the assets of the Exchange. . . ." (Emphasis ours.)

"As compensation for the assignment and transfer to it of the assets of the Exchange, Company will pay . . . an amount equal to the 'adjusted net worth' of the Exchange, computed as follows:"

The provisions are then to the effect that first the net worth of the Exchange (including the reserve for contingencies, special surplus and unassigned surplus) is determined according to an audited balance sheet as of December 31, 1948, on which all assets are valued at market value as of December 31, 1948; thereafter adjustments are made in many items of that balance sheet on the basis of the actual results obtained during the running out of the business of the Exchange during three years. If all items on the balance sheet were adjusted according to the results of the running out, all assets were liquidated during those three years and nothing whatever would remain as advantage to the Company, it could be said that nothing was actually purchased by the Company and that notwithstanding the word "sell" used in the agreement the transaction was actually an agreement to liquidate. However that is not the case. No adjustment is provided for the investments. On the balance sheet as of December 31, 1948, which is in evidence as Plaintiffs' Exhibit 80, there appear United States government obligations for $3,175,000. They are acquired by the Company at that price without any adjustment or duty to account for their liquidation. Although the purchase takes place at market value it is nevertheless a violation of section 1101, Insurance Code, which prohibits

any purchase of assets of the insurer by its managing officers and which in that respect differs from section 421a, Civil Code, which governed the subject prior to the enactment of the Insurance Code and which prohibited such purchases only if made "for a less sum than the current market value." Said change must have been deliberate and the provision of section two of the Insurance Code that provisions substantially the same as preexisting provisions will be construed as restatements thereof has no application.

Another circumstance which shows that the Company did not act merely as liquidator is of greater importance from a practical point of view. By taking over all assets, assuming all liabilities, including all outstanding policies of the Exchange and becoming directly liable thereon to the policyholders, the Company acquired the whole business of the Exchange as a going concern and would therefore benefit by the increase of its clientele. Characteristic in this respect is the following passus from the document sent by the Advisory Committee to subscribers on November 29, 1948, setting out and recommending acceptance of the proposed plan:

"At normal expiration of your policy, in 1949, you will be offered a participating policy by Industrial Indemnity Company, a stock company. . . . (b) Your policy with Industrial Indemnity Company will be serviced by the same personnel, located at the same offices as in the past." That in this manner the Company received an advantage not consistent with the position of a mere liquidator seems obvious. The findings show that the Commissioner was also of this opinion. We find in finding 47 that it was the position of the Insurance Commissioner at the outset of the negotiations, that the amount to which subscribers were entitled should include "an amount representing a reasonable going concern value of the Exchange as measured by the value to the Company of any Exchange business it might take over in the event of consolidation. . . .

"The Insurance Commissioner thereafter concluded that any business taken over by the Company in the event of consolidation of Company and Exchange would not result in any profits to Company greater than the profit then being made by the attorney-in-fact of the Exchange, that the profit being made by the attorney-in-fact of the Exchange did not belong to the subscribers at the Exchange, and thereafter abandoned his position that any amount should be paid or recognized as representing going concern value of the Exchange." If the Attorney would lose as much as the Company would win,

there might, considering their identical ownership, be good reason for the Commissioner not to persist in his demand of separate payment for going concern value, but his original demand and the reason given for his desisting show his conviction that the Company would obtain business from the Exchange which would be of value for the Company, and even if the concessions made by the Company and the Attorney, stated hereinbefore, would sufficiently compensate the subscribers for said advantage received by the Company, that would not alter the fact that the Company was not only liquidator but beneficially acquired at least the investments and the going business. The fact that during the years 1946, 1947 and 1948 more premium was returned to subscribers of Exchange than was in accord with the actual business results of these years (finding 66) does not show that the acquisition of the large going business of Exchange was not valuable to Company.

Respondents urge, however, that even if it were an actual sale, as we consider it, the agreement would come under an exception to section 1101 contained in section 1105, reading: "This article shall not prevent: (a) The purchase by any person of any asset which the commissioner requires to be sold, at a price approved by the commissioner." The contention is without merit. The Commissioner did not require and had no power to require the sale of the whole business of the Exchange as a going concern. ■ To "require" in this sense means "to demand; to claim as by right and authority; to exact." (Webster.) The Commissioner did not demand it and had no authority to demand it. Respondents' contention is based on the fact that the Commissioner threatened suspension or revocation of the certificates of authority of Exchange and Company if his objections to the interrelation of the Attorney and the Company and other matters stated in the "Accusations" would not be remedied to his satisfaction. However, it is not true that the remedy he primarily wanted or which he required was the taking over of the Exchange by the Company. The court found (in finding 47): "The preferred plan of the Commissioner was one of separation." In the Statement of the Exchange of November 29, 1948, outlining principal terms of the plan, it is said that the discussions with the Commissioner revealed "that the problems presented might be solved either by a complete separation of the two organizations, or by a merger of Industrial Indemnity Exchange and Industrial Indemnity Com-

pany upon the terms herein set forth. Upon giving thorough consideration to both of these possibilities, it was found that the first alternative was not acceptable to the attorney-in-fact and the Company. . . . *The representatives of the Insurance Commissioner have stated that when this plan is formally submitted to the Commissioner, they will be inclined to recommend its approval."* The above quotations show that the transaction was not authoritatively demanded by the Commissioner but preferred by the Attorney and the Company and approved by the Commissioner. This is also shown by the requirement of approval by subscribers. It is said in respondents' brief (pp. 120-121): "It was the position of the Commissioner of Insurance that it [the agreement] would have to be approved by a majority of the policyholders. . . . On the other hand, respondents felt that the agreement should have the approval of more than a bare majority of the policyholders and the agreement was drawn up on the basis of approval of two-thirds of the policyholders." The necessity of approval of policyholders is inconsistent with a transaction demanded by the Commissioner as of right.

Moreover, the history of section 1105, subdivision (a) shows that it was meant to relate to a specific, limited subject matter. Prior to the enactment of the Insurance Code the provisions as to investment of insurance companies were contained in section 421, Civil Code, the prohibition of benefits of officers etc., from such investments or of interest in the sale of assets in section 421a of the same code. Among the provisions of section 421 was the following: "It shall be the duty of the secretary of any such investing corporation to report in writing during the months of January and July of each year to the insurance commissioner the data above set forth respecting each such investment, and the insurance commissioner may, if any such investment is not approved by him, *require the corporation to sell* or dispose of the same." (Emphasis ours.) The last sentence of section 421a then contained the exception which is now section 1105 subdivision (a), Insurance Code: "Nothing contained herein, however, shall prevent the purchase by any such person of any asset which the insurance commissioner may *require to be sold,* at a price approved by him, . . . " (Emphasis ours.) There can be no doubt that the above provision of section 421a was intended to relate to the quoted provision of the preceding section. At the enactment of the Insurance Code the quoted provision of section 421 became with a few changes section 1202, Insurance

Code, and it was later recast to provide that the Commissioner may in his discretion and after hearing by written order require the disposal of any investment made in violation of the provisions of this article. In 1945 the Commissioner was also given power to demand disposal of specific investments in real estate if he decides that the interest of the insurer so requires. (Ins. Code, § 1194.9.) ■ We are of the opinion that the present provision of section 1105, subdivision (a), Insurance Code, relates to the specific provisions of sections 1202 and 1194.9 in the same manner as formerly the provision of section 421a, Civil Code, related to the one in section 421, Civil Code. ■ There is in the code no provision which gives the Commissioner power to demand the disposition of all assets of an insurer or of his whole business as a going concern. The exception of section 1105, subdivision (a), is therefore applicable only to disposition of specific assets demanded by the Commissioner on the basis of specific powers given him in the code and not to the agreement here under review.

■ In holding that said agreement is void as violative of section 1101, subdivision (c) of the Insurance Code, we are convinced that we do not extend the application of said provision further than is necessary to effectuate its purpose, which is to prevent all possibility that those who have authority over an insurer might profit or their action might be influenced by the desire to profit from the acquisition of the assets of said insurer. The difficulties in this case were caused by the conduct of the members of the Attorney, who were simultaneously in the insurance business for their own account in corporate form and who interlaced the business of their private corporation and the business of the Exchange which they managed to such a degree that the Commissioner would not permit the resulting situation to continue. Even if their said conduct was in good faith and proper, as found by the court below, it would create a precedent wholly adverse to the purpose of section 1101, subdivision (c), if they were permitted to solve the difficulties so caused by absorbing the going business of the Exchange into their privately owned corporation, even if the price they paid for it would be adequate.

■ Evidently if the transaction is a sale violating section 1101 and section 1106, Insurance Code, the Commissioner's approval can not override the law and validate the agreement where the code does not grant him power to do so.

As it will be our decision that the original action for declaratory relief must be dismissed and there will be no new

trial the above fully disposes of said action and none of the many points advanced by the parties in that respect require review. However the cross-actions which among other things claim for the Exchange all the business of the Company are in part not dependent on the validity of the agreement merging Exchange and Company and the correctness of the denial of all relief to cross-complainants must therefore be reviewed.

The claims of appellants to all the business of Company are governed by a principle developed mainly with respect to the relation between corporations and their directors and officers and there known as the doctrine of corporate opportunities. ■ Since the leading case of *Guth* v. *Loft,* 23 Del.Ch. 255 [5 A.2d 503], it has been generally accepted that a corporate officer or director may not seize for himself to the detriment of his company business opportunities in the company's line of activities which the company has an interest and prior claim to obtain, and that if he seizes them in violation of his fiduciary duty the corporation may claim for itself all benefits so obtained by him. ■ ■ The doctrine was applied in this state to joint venturers in *MacIsaac* v. *Pozzo,* 81 Cal.App.2d 278 [183 P.2d 910] and is equally applicable in all situations in which a person manages or transacts business for another or for others to whom he stands in a fiduciary relation without being trustee of an express trust. ■ The position of the attorney-in-fact of a reciprocal insurance exchange, who manages the business of the exchange under powers of attorney of the subscribers, who provide the means for the reciprocal insurance enterprise, is fiduciary in character to the same extent as that of the management of an incorporated mutual insurance company, although neither is a real trustee. (See *Caminetti* v. *State Mut. Life Ins. Co.,* 52 Cal. App.2d 321, 323 [126 P.2d 165]) and the doctrine of corporate opportunities is equally applicable.

However this doctrine does not exclude the fiduciary from all business activity of his own in the field in which he works for others. ■ "Generally, it is held that the directors or officers of a corporation are not, by reason of the fiduciary relationship they bear towards the corporation and the stockholders thereof, precluded from entering into and engaging in a business enterprise independent from, though similar to, that conducted by the corporation itself, provided in doing so they act in good faith and do not interfere with the business enjoyed by the corporation. . . . The directors or officers of a going, solvent corporation cannot, however, engage in a com-

peting business to the detriment of the corporation which they represent." 13 Am.Jur. 953, Corporations, § 999. To the same effect 19 C.J.S. 160, Corporations, § 785; 3 Fletcher, Corporations (1947 rev.) 214-215, § 856; Ballantine on Corporations (1946 ed.) 203 et seq., § 79. █ The latter points out (p. 205) that the basis of the doctrine must be found "in the unfairness on the particular facts of a fiduciary taking advantage of an opportunity when the interests of the corporation justly call for protection," (to the same effect Prof. Scott in 37 Cal.L.Rev. 539, 551) and continues: "This calls for the application of ethical standards of what is fair and equitable to particular sets of facts. The question is indeed often a close one whether the fiduciary duty of loyalty of directors and officers requires them to offer a particular business opportunity which they discover in connection with the corporate business to the corporation . . . or whether they may take it for themselves. This turns . . . upon various factors as to the needs and situation of the corporation, its financial ability and fair expectation under the circumstances, which cannot be reduced to definite rules." Under these circumstances the decision in each case depends on its particular facts and citation of examples is not useful. █ The determination of the particular factual circumstances under which a fiduciary takes business opportunities for himself and the application of the ethical standards of fairness and good faith required from a fiduciary to said set of facts is mainly for the trier of facts. █ Both the issues of good faith and of sufficient performance of contractual obligations are normally questions of fact (53 Am.Jur. p. 192, § 224; p. 231, § 273).

In this case the court below made most elaborate findings as to all circumstances on which it based its holding that the cross-defendants have not breached their fiduciary duty. Before stating their contents, we shall point out some differences between a reciprocal insurance exchange and a normal corporation which may be of importance with respect to the correctness of said holding. Stockholders in a corporation normally participate for the purpose of making profit either in the form of dividends or of increase in the value of their holding. Subscribers in an interinsurance exchange do not participate for that purpose but for the purpose only of obtaining insurance for themselves at a price and in a manner attractive to them. (There was some express testimony to that effect in this case.) Expansion of a lucrative business so

far as that is possible on the basis of the capital provided by the stockholders or accrued in prior business will as a rule benefit the stockholders, whereas subscribers of a reciprocal insurance exchange do not necessarily profit from further expansion once a sufficient size is reached to secure adequate spread of risk and stability of rate of loss; the savings and the policies that share in their distribution may well increase in the same proportion. It is clear that if it were found that further expansion would not benefit existing subscribers, that fact might be considered in deciding whether the attorney-in-fact had violated his fiduciary duty in taking opportunities for further insurance business for himself.

Another distinction to be noted is that the business of a corporation is normally transacted by means of personnel, offices and equipment built up and paid for by the company, so that the company only is entitled to their services and use and directors or officers who use any of them for their private business ventures thereby violate their fiduciary duty. In a reciprocal insurance exchange and at any rate in the exchange here involved, the attorney-in-fact contracts to provide and pay for the whole management and administration of the Exchange including all personnel, offices and equipment required for the transaction of the business of the Exchange in consideration of certain fixed percentages of the net premiums deposited, which consideration is therefore dependent on the size of the business transacted only, not on the costs of providing personnel, offices and equipment. There is therefore not necessarily a requirement that the personnel and plant which the attorney-in-fact builds up and pays in his business of insurance management be used by him for the management of the one enterprise only in relation to which he started it, if the management and administration he provides for that first enterprise remain good.

We now turn to the circumstances found by the court. From the substance of its findings we note the following; the numbers are those of the findings from which the statements preceding them were taken:

Neither before nor after the entry of the Company into business did the Exchange write nonparticipating policies, the attorney having been advised that such would violate the Insurance Code (10). Company started in workmen's compensation insurance business in 1940 by issuing nonparticipating policies to supplement the participating insurance offered by the Exchange and thus to make profit for the Com-

pany (18). The Exchange, which had until 1942 mostly sold insurance directly to the insureds, then changed its policy to sell through agents and brokers, who control 75 per cent of the workmen's compensation insurance business in California and whose reluctance to place business with a carrier who sells directly to insureds would have hampered the acquisition of additional business by Exchange (19, 20, 21). In 1943 Company began to write also participating workmen's compensation insurance to supplement the types of insurance offered with participating insurance in a stock company for which there was demand (22). The name "Industrial Indemnity" and certain insignia used by both Company and Exchange were originated by the Attorney and used by Exchange before they were used by Company; the use by Company did not cause confusion or loss of any business by Exchange (11). Since 1939 the Attorney and the Company used the same offices, equipment and personnel. Originally they were those of the Attorney, Company paying Attorney for their use a percentage of Company's net premium income. Since 1946 Company, having taken over offices, equipment and personnel of the Attorney, was paid by Attorney 14 per cent of the net premium income of Exchange out of the 17½ per cent of said income which Attorney received for its services as such. The 14 per cent constituted the actual cost to Company of the facilities and services made available to the Attorney. The Attorney retained its own function and responsibility. The contract was to the advantage of Exchange and was reasonable and proper. Company and Attorney at all times maintained separate books and records (31-34). The Attorney and Company always maintained the separate characteristics of Company and Exchange; insurance brokers, agents and insureds were always familiar with their separate entities (17). It was the policy of the Exchange to write policies of larger premium size, policy of the Company to write those of smaller premium size (28). Company paid approximately 2½ per cent more commission than Exchange to compete with other stock company insurers, Exchange returned approximately 2½ per cent more savings than Company. Insurance buyers utilized Company and Exchange according to their separate characteristics, Exchange for larger risks, Company for smaller and nonparticipating risks (36). The owners of the Attorney and Company had no interest in procuring new business for Company to the prejudice of Exchange and did not procure any business for Company to the prejudice of

Exchange, nor did they cause to be placed in Company any business that could have been placed in Exchange (102, 97). They and their agents made no attempt to attract business to the Company rather than to the Exchange and often placing of insurance in Exchange was more recommended by them than placing in Company (24). No known or appreciable business was lost by Exchange, which would have been placed in it had it not been placed with Company, and substantial business was gained by Exchange as a result of the Company's being in business (23, 25-27). Company has never been operated in competition with Exchange (23, 96, 102). Prior to 1940 Exchange had reached a size sufficient to secure adequate spread of risk and stability of loss ratio. Further acquisition of new business would not result in any advantage to its existing subscribers by reduction of premium, better service, increase of premium returned to them or in any other way. During 1948 and several prior years Exchange wrote the largest volume of premiums of all reciprocal workmen's compensation insurance carriers in California. (29, 99). The Company did not at any time in the operation of its business use any funds, facilities or information belonging to, or secured through, the Exchange (104). To engage in workmen's compensation insurance business through the medium of Company was no violation of any duty owed by the Attorney or its members to the subscribers of Exchange (98). The insurance business now being transacted, or at any time transacted, by Company is neither in law nor in equity the property of Exchange or its subscribers (100).

As we have held that the establishing of the circumstances under which the Attorney engaged in workmen's compensation insurance business of its own and the weighing of these circumstances in relation to the duty of fairness and good faith incumbent on the Attorney as a fiduciary were matters of fact, the decision of which by the trier of facts is as a rule binding on appeal, it seems evident that the findings stated are fatal to the appeal with respect to the claims of subscribers of Exchange to the business of Company unless appellants have shown that they are not supported by the evidence. This they have failed to do. In their opening briefs they have ignored them. By way of replication it is argued that the findings are based on undisputed facts substantially all presented by respondents and that although the inferences made from these facts in the findings are in dispute, such inferences drawn from undisputed testimony are no more than conclusions of

law not binding on a reviewing court. This theory is wholly erroneous, apart from the question whether it is true that there was no conflict in the evidence. This court held in *Spolter* v. *Four-Wheel Brake Serv. Co.,* 99 Cal.App.2d 690, 693 [222 P.2d 307], quoting in support *Mah See* v. *North American Acc. Ins. Co.,* 190 Cal. 421, 426 [213 P. 42, 26 A.L.R. 123], that it is settled law that if conflicting inferences may reasonably be drawn from the evidence, even if it is uncontradicted or all facts are admitted, which inference shall be drawn is a question for the trier of facts and its decision cannot be set aside by the appellate court. See, also, *Hamilton* v. *Pacific Elec. Ry. Co.,* 12 Cal.2d 598, 603 [86 P.2d 829]. ■ Only where there is no conflict in the evidence *and no conflicting inferences can be drawn therefrom* does the finding of the trial court amount to a conclusion of law and is the finding not binding on a reviewing court. (*Export Leaf Tobacco Co.* v. *County of Los Angeles,* 89 Cal.App.2d 909, 916 [202 P.2d 622].) The above rule where findings are based on inferences does not differ in principle from the well known rule governing findings based on direct evidence, to wit, that they are binding on the reviewing court when supported by any substantial evidence. (*Vaccarezza* v. *Sanguinetti,* 71 Cal.App.2d 687, 691 [163 P.2d 470].) ■ It has been repeatedly held that an appellant who contends that findings of fact are not supported by the evidence, must point out the evidence involved and show wherein it does not support said findings. (*Sutro Heights Land Co.* v. *Merced Irr. Dist.,* 211 Cal. 670, 697 et seq. [296 P. 1088]; *Metzenbaum* v. *Metzenbaum,* 96 Cal.App.2d 197, 199 [214 P.2d 603].) The latter case justifies said requirement on the ground that it facilitates the disposition of litigation before appellate courts, especially where records are voluminous, and discourages rash appeals. A rule of the same kind must for the same reasons apply when appellant contends that the findings cannot by reasonable inference be derived from the evidence. As we recently said in *Richards* v. *Plumbe,* 116 Cal.App.2d 132, 134 [253 P.2d 126]: ". . . the burden is on the appellant to show such a lack of substantial facts in the record that the reviewing court may say as a matter of law that there is no ground upon which the trial court could have based any reasonable inference in support of its finding, and unless this burden is met, a reversal should not be ordered." The appellants herein can certainly not be absolved from said duty where the evidence before us consists of nearly 3,000 pages of reported testimony and 145

exhibits, and the findings alone cover nearly 60 pages. Those evidentiary facts as to which the parties agree do not make it clear at first sight that the inferential findings made by the trial court cannot possibly be correct, and appellants have failed to make the specific and detailed showing required from them as stated above. It is symptomatic in that respect that even in the reply briefs only one finding is specifically mentioned, to wit, the finding that Company has never been operated in competition with Exchange. This finding evidently follows as a reasonable inference from other findings of probative facts succinctly stated by us, but wholly ignored by appellants even in their replication, although these evidentiary facts found clearly tend to destroy all elements of competition, detriment to the Exchange, and bad faith of the Attorney. Under these circumstances it is not for us to say that the ultimate findings of the court below are necessarily improper inferences nor can we hold as a matter of law, contrary to said findings, that the Attorney breached its fiduciary duty to subscribers when it engaged in the writing of workmen's compensation insurance through the medium of Company or that the business of Company was in equity the property of Exchange.* We are the more satisfied that this result is not unjust because the gain by Exchange of all profits of the business of Company without participation in them by any of Company's insureds would have given the subscribers of the Exchange a windfall wholly out of line with the setup of such Exchange.

However it does not follow that cross-complainants are not entitled to any relief. Although we hold that the subscribers of Exchange are not entitled to the business built up by Company in general—and then they are necessarily not entitled either to the business of its wholly owned subsidiary, Industrial Service Company, mentioned separately on appeal —they have a right to the business taken over by Company in consequence of the transfer and assumption agreement, which we have held to be invalid. If they so desire they are entitled to have that matter wound up in these equity proceedings and for that purpose the judgment denying all relief on the cross-complaints will also have to be reversed.

Appellants do not assign as error the failure of the court below to make in the judgment express declarations of right as to other matters stated in the cross-complaints. As said

---

*The contention of intervener that findings 18, 39 and 85, which are somewhat connected with the matter here treated, contain inconsistencies is without merit.

before, all findings in that respect were adverse to cross-complainants. None of these findings were attacked in the opening briefs of appellants and even in the reply briefs no sufficient showing of insufficiency of the evidence to support them was made. On the same grounds and authorities as stated with respect to the findings regarding the alleged disloyal diversion of business by the Attorney the findings as to the other criticisms of the action of the Attorney must stand.

The desired decree rescinding intervener's consent to the transfer and assumption agreement and all matters relating to it have lost all materiality by our holding that said agreement is illegal. ▮ An illegal contract cannot be ratified (*Fewel & Dawes, Inc.* v. *Pratt,* 17 Cal.2d 85, 91 [109 P.2d 650]). For the same reason consenting subscribers of Exchange cannot have been prejudiced by the fact that intervener was not permitted pending trial to amend its complaint so as to appear in a representative capacity for them, the right of rescission being the only point which its complaint added to the matters already before the court by the cross-complaint of certain defendants acting in representative capacity for all subscribers. ▮ The allowance or rejection of the amendment offered at that time was within the discretion of the trial court. The ruling will not be disturbed on appeal as no abuse of discretion, no good reason for the delay and no necessity of the amendment in furtherance of justice is shown. (*Westwood Temple* v. *Emanuel Center,* 98 Cal. App.2d 755, 765 [221 P.2d 146] and cases there cited; *Peterson* v. *Peterson,* 74 Cal.App.2d 312, 323 [168 P.2d 474].)

Defendants in the cross-actions have in the court below taken the position that the cross-actions were barred by the statute of limitations and by laches and have cross-appealed from the trial court's rejection of said defenses. As in the cross-actions, relief will be granted only with respect to the consequences of the illegality of the transfer and assumption agreement to which said defenses do not apply, their cross-appeal has lost all materiality and will be dismissed.

Under the special circumstances of this case it seems just that each party bear its own costs on appeal.

The judgment is reversed with directions to the trial court to deny all declaratory relief to plaintiffs on the ground that the agreement as to which it is prayed for is void as contrary to law; if defendants-cross-complainants so desire, to grant them such relief as the court will deem fit to enable

them to recover in their representative capacity for subscribers the business and assets obtained by Company in consequence of the agreement herein held to be invalid, and to wind up fully all matters relating thereto; to make, if defendants-cross-complainants so desire and they have made a showing that financial advantages have been obtained by the subscribers they represent because of their services and the services of their attorneys, such orders as the court will deem fit fixing and allowing compensation for said services and providing for payment thereof out of the funds and assets recovered; the cross-appeal of defendants in the cross-actions is dismissed; the respective parties to bear their own costs.

Goodell, J., and Dooling, J., concurred.

A petition for a rehearing was denied May 29, 1953, and intervener and appellant's petition for a hearing by the Supreme Court was denied June 18, 1953.