[Civ. No. 15610.   First Dist., Div. One.   Dec. 4, 1953.]

ROBERT AARON et al., Appellants, v. JOSEPH L.
PUCCINELLI et al., Respondents.

Barrett & Harkleroad and Healey & Walcom for Appellants.

Morris M. Grupp for Respondents.

BRAY, J.—From a decree in declaratory relief in favor of defendants, plaintiffs appeal.

### QUESTION PRESENTED

Did plaintiffs' own acts terminate the fiduciary relationship then existing between them and defendants?

### EVIDENCE

This action was brought to establish a trust in favor of plaintiffs in a certain lease held by defendants. Since about 1920 certain premises in San Francisco have been known as ''Coliseum Market.'' The business of the market was operated under lease from the owners of the realty by three distinct departments, a meat department, a grocery department, and a combined fish and vegetable market. Each department was owned by a separate partnership and operated independently of any other department. The personnel of these partnerships varied from time to time as members died or partnership interests were sold. No partner in one department ever had any interest in any other department. In 1941, a 10-year lease was obtained. This lease was not signed by all of the then partners in the three departments. The lease provided that no assignment of any interest in it could be made without consent of the lessors. No formal consents to assignments of the lease interests were made when changes were made in ownership of interests in any of the departments. However, the lessors accepted the new partnership members without releasing the old, even though they refused to recognize an assignment from the outgoing member. At the time of the occurrences upon which this suit is based, the meat department was owned by the three plaintiffs, the grocery department by Vincent P. Nicolai and Angelo Nicolai, and the vegetable and fish department by defendants. Of the original signatories to the lease, there were then left only Vincent P. Nicolai of the grocery department, and defendants Puccinelli and Dell 'Osso of the fish and vegetable department. Although none of plaintiffs was signatory to that lease, the landlord by reason of plaintiff's having succeeded to the interests of the

original meat department partners, recognized them as tenants along with the partners in the other two departments.

Over the years each department paid one-third of the rental prescribed in the lease, and of the costs incident to the maintenance of the premises, such as janitorial services, utilities, watchmen, insurance, also one-third of the advertising. Otherwise the departments were independently operated, except that all departments cooperated for the common good. Of course, each department bore its own losses and retained its own profits.

In 1949 the lease had approximately three years to run. The departments desired to continue operations as in the past, remodel the market by interior and external changes, and obtain a renewal of the lease. Conferences with the landlord and between the departments were held. The departments could not agree on the changes to be made. The record is highly controversial concerning these discussions, but all parties agree that no agreement was reached and that the discussion terminated in December, 1949.

### TERMINATION OF FIDUCIARY RELATIONSHIP

Before proceeding to the next occurrences, it would be well to consider the legal relationship of the parties at that time. Although all of the partners in the three departments were not formally parties to the lease, they were recognized by the landlord and each other as cotenants. ▆ An assignment by operation of law takes place by the landlord's acceptance of a new tenant and the consent of the old tenant. (*Baker* v. *Maier & Zobelein Brewery,* 140 Cal. 530 [74 P. 22].)

▆ As cotenants, each bore to his other cotenants a fiduciary relationship.

After the negotiations between the departments themselves and with the landlord had terminated in December, 1949, the Nicolai brothers wanted to sell their grocery department to one Scagolia, who apparently would not buy unless a longer lease could be obtained than then existed. The Nicolais commissioned their attorney, Young, to obtain such a lease. Young contacted the landlord. The latter was not satisfied with Scagolia's financial responsibility. What occurred from then on is highly controverted. However, there is substantial evidence to support the court's finding that then plaintiffs without the consent or knowledge of defendants engaged Young to secure a lease for them alone. After the landlord's refusal to execute a lease to Scagolia, Young met with plaintiffs, and

then negotiated with the landlord for a lease to plaintiffs alone, stating that the departments could not get together and the landlord should lease to plaintiffs and the others could sublet from plaintiffs. Besides talking to the landlord about it, Young wrote a letter to him dated December 30, 1949, proposing terms for such a lease. The landlord requested a statement of the financial responsibility of the three plaintiffs and on January 19, 1950, Young sent him such a statement. Late in December, defendant Puccinelli in a conversation with the landlord learned that plaintiffs had been negotiating a lease for themselves. Puccinelli then suggested a lease to him and his partners. The landlord asked for a financial statement. Apparently the landlord preferred defendants' financial responsibility to that of plaintiffs, for on January 25, 1950, a 10-year lease was executed with defendants. Defendants did not disclose to plaintiffs the existence of the lease. Plaintiffs in April, 1950, learned of it for the first time. In May defendants offered plaintiffs a sublease which they refused. Defendants then served on plaintiffs notice of an increase of rental effective June 1st, and a notice to quit effective September 1st.

■ Plaintiffs contend that the evidence shows that defendants in obtaining the 1950 lease were obtaining it as joint venturers for themselves and plaintiffs. While there was evidence from which the court could have so concluded, there is substantial evidence to the contrary. Undoubtedly at the time the parties first negotiated with the landlord for an extension of the existing lease, there existed a fiduciary relationship between the parties, and even after the negotiations were broken off, had defendants obtained a new lease it would necessarily have been for the benefit of plaintiffs as well as of defendants. (*Koyer* v. *Willmon,* 150 Cal. 785 [90 P. 135]; *Thayer* v. *Leggett,* 229 N.Y. 152 [128 N.E. 133]; *Hendrickson* v. *California Talc Co.,* 55 Cal.App.2d 467 [130 P.2d 806]; *Stewart* v. *Shearman,* 22 Cal.App.2d 198 [70 P.2d 702]; *Munson* v. *Fishburn,* 183 Cal. 206 [190 P. 808].) But, after the negotiations were terminated and plaintiffs for themselves alone started to negotiate with the landlord, the fiduciary relationship was terminated and it became a case of each party for himself.

"As said in *Beck* v. *Cagle,* 46 Cal.App.2d 152, 162 [115 P.2d 613], 'The abandonment or dissolution of a partnership or joint adventure may take place by conduct inconsistent with its continuance.' (See, also, *Middleton* v. *Newport,* 6 Cal.

2d 57, 62 [56 P.2d 508]; and *Fooshe* v. *Sunshine,* 96 Cal. App.2d 336, 343 [215 P.2d 66, 16 A.L.R.2d 1143].) '' (*Richards* v. *Plumbe,* 116 Cal.App.2d 132, 138 [253 P.2d 126].) In *Smith* v. *McNutt,* 156 Cal. 769 [106 P. 70], it was held that the principle that a cotenant or person placed in a situation of trust or confidence who purchases trust property holds it in trust for the others, can have no application in the absence of the relationship which constitutes the whole reason for its existence. Obviously, the same rule would apply to leasing as well as purchase.

In our case the court found that plaintiffs did not come into court with clean hands. Their attempt to get the lease for themselves alone supports this finding.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.